**Richard Lee FRANKS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–00–431–CR.**

Court of Appeals of Texas,
Fort Worth.

July 18, 2002.

Rehearing Overruled Sept. 12, 2002.

Rehearing En Banc Overruled
Oct. 24, 2002.

L. Patrick Davis, Fort Worth, for Appellant.

Tim Curry, Dist. Atty., Charles M. Mallin, Chief Appellate Assistant District Attorney, Edward L. Wilkinson, Gregory Miller, Lisa Callaghan, Asst. Dist. Attorneys, Fort Worth, for Appellee.

Panel B: DAY, LIVINGSTON, and GARDNER, JJ.

## OPINION

SAM J. DAY, Justice.

### I. INTRODUCTION

A jury convicted Appellant Richard Lee Franks of aggravated kidnapping, and the trial court assessed punishment at life imprisonment. In nine points, Appellant complains about: (1) the alleged denial of his right to a fair and impartial trial; (2) the trial court's denial of his motion to suppress the fruits of his detention; (3) the trial court's denial of his motion for an instructed verdict; (4) the trial court's denial of several motions for mistrial; (5) the trial court's refusal to include an article 38.23 instruction in the jury charge; (6) the trial court's denial of his motion for continuance; and (7) the effectiveness of his trial counsel. We affirm.

### II. BACKGROUND

On the evening of March 26, 1999, six-year-old Opal Jennings was playing with her two-year-old cousin Austin and four-year-old friend Spencer Williams on a lot adjacent to Opal's grandparents' house. While the three were playing, a car pulled up to the curb, and the driver got out, said hello to the kids, picked up Opal, hit her in the chest, threw her into his car, and drove off. Spencer described the abductor as a dark or light-complected, slender man who had long hair pulled back into a ponytail and marks on his face. Spencer further stated that the abductor was wearing a short-sleeve T-shirt, dark pants, dark sneakers, and a red ball cap and was driving a "purpledy-black" car.

A person who regularly met with Appellant believed that the description given by Spencer matched Appellant and Appellant's new car. Therefore, he contacted the appropriate authorities. When the authorities went to question Appellant, they noticed a black Cougar in his driveway and later learned that one of Appellant's brothers had previously lived on the same street as Opal.

Appellant was arrested on an outstanding traffic warrant. While in custody at the special crimes section of the Tarrant County District Attorney's Office, Appellant consented to a search of his vehicle and gave a statement. Based on the statement, Appellant was arrested for the aggravated kidnapping of Opal.

### III. RECUSAL

Appellant argues in his first point that he was denied due process because the trial judge, the Honorable Robert Gill, was not impartial. Specifically, Appellant contends that Judge Gill was required to sua sponte recuse himself from Appellant's trial when Judge Gill's testimony from a previous motion to recuse concerning disputed facts was introduced as evidence in Appellant's motion to suppress hearing over which Judge Gill was presiding.

Appellant was indicted on March 16, 2000, for the March 1999 aggravated kidnapping of Opal Jennings, and the case was assigned to the 213th District Court, over which Judge Gill presided. On June 14, 2000, Appellant filed a motion to recuse Judge Gill from hearing Appellant's case based on the fact that Judge Gill had signed Appellant's arrest and search warrants and had consequently determined the existence of probable cause, which Appellant contended constituted "comments reasonably calculated to be disseminated to the . . . seated venire . . . bearing on the Defendant's innocence and admissibility of critical evidentiary matters."

Appellant's recusal motion was set for a hearing on June 19, 2000, in front of the Honorable Jeff Walker. During the hearing, Judge Gill acknowledged that he signed Appellant's arrest and search war-

rants as well as the State's motion to seal the arrest warrant and affidavit. However, he explained that he did not recall discussing anything outside the four corners of the affidavit serving as the basis for the search warrant. Judge Gill also asserted that while he did not have much contact with Appellant during his arraignment, he noticed that Appellant was quiet. When questioned about the possibility that he could be called as a fact witness in Appellant's case based on his observation of Appellant's demeanor, Judge Gill responded that there were a number of people who could testify to the same things. However, he stated without an explanation that he did not agree that Appellant's counsel could call him as a witness concerning those warrants he signed in relation to Appellant's case. He also testified that he would expect to preside over pretrial motions to suppress the evidence he had previously concluded constituted probable cause to support the issuance of arrest and search warrants, but that it would not cause him any problems. Judge Gill finally testified concerning the effect his signing of the warrants would have on the jury's impartiality. Specifically, Judge Gill asserted that his actions in setting Appellant's bail at $1,000,000, determining there was sufficient probable cause for Appellant's arrest, and determining that there was sufficient probable cause to search Appellant's car did not constitute opinions on the case that could be conveyed to the jury. Following the hearing, Judge Walker concluded that Judge Gill's actions in this case would not raise questions about his impartiality and denied Appellant's motion.

Before Appellant's first trial for this offense, he filed a motion to suppress, which Judge Gill denied. Appellant did not call Judge Gill as a witness in the hearing or introduce his testimony from the recusal hearing into evidence.

Before Appellant's second trial, he filed a motion for Judge Gill to reconsider his ruling on Appellant's previous suppression motion. During the hearing on his motion, Appellant called Judge Gill to testify; however, Judge Gill refused. Therefore, Appellant introduced Judge Gill's testimony from the recusal hearing into evidence. After the introduction of the trial transcript from the recusal hearing, the following exchange occurred:

THE COURT: Is there anything in particular in the trial testimony that you want to cite me to?

[DEFENSE COUNSEL]: Judge, nothing in particular. We find it to be very excessive. But I would go to the recusal hearing and I'd like to cite one thing.

The Honorable Robert Keith Gill testifying. (Reading:) Question by [Defense Counsel]: Are you familiar that one of the grounds to recuse under Rule 18(b) is personal knowledge of disputed evidentiary facts concerning the proceeding?

Answer: If it's not, it should be.

Your Honor, for all those reasons, we'd ask that you grant this motion to suppress and anything else, Your Honor, counsel wants to offer is fine.

Judge Gill denied Appellant's motion.

Appellant argues that the failure of Judge Gill to recuse himself sua sponte violated his due process and due course of law rights under both the federal and state constitutions. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 19. Specifically, Appellant initially contends that his conviction is void pursuant to the trial court's violation of rule 605 of the rules of evidence. *See* TEX.R. EVID. 605.

█ Rule 605 states in full that "[t]he judge presiding at the trial may not testify

in that trial as a witness. No objection need be made in order to preserve the point." *Id.* The language of rule 605 is unambiguous in its prohibition against a judge who is presiding over a proceeding from stepping down from the bench and becoming a witness in the very same proceeding over which he is currently presiding. *Hensarling v. State,* 829 S.W.2d 168, 170 (Tex.Crim.App.1992). We agree that under the applicable rule, Judge Gill's testimony should not have been admitted into evidence.

■■■ However, while we recognize the importance and mandatory nature of this rule, we are also cognizant of Appellant's own role in any error. When requested to testify, Judge Gill refused and explained that he could not testify in the case. Appellant then introduced Judge Gill's testimony from the recusal hearing without any objection by the State, and Judge Gill admitted it into evidence. While it is true that Judge Gill could have refused to admit such evidence, the defendant, as a general rule, cannot invite error and then complain about it on appeal. *Hess v. State,* 953 S.W.2d 837, 840 (Tex.App.-Fort Worth 1997, pet. ref'd). In other words, a "defendant may not create reversible error by his own manipulation." *Beasley v. State,* 634 S.W.2d 320, 321 (Tex.Crim.App. [Panel Op.] 1982); *see also Kelley v. State,* 823 S.W.2d 300, 302 (Tex.Crim.App.1992). This rule applies whether or not the error is perceived to be fundamental. *Hess,* 953 S.W.2d at 841; *see also Cadd v. State,* 587 S.W.2d 736, 741 (Tex.Crim.App.1979) (op. on reh'g) (applying the rule of invited error to dispose of an issue on rehearing which, on original submission, the court determined constituted fundamental error).

In *Prystash v. State,* 3 S.W.3d 522, 529–31 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000), the defendant requested the omission of a jury charge that was statutorily required to be given. The defendant argued on appeal that the trial court had erred in failing to submit the issue to the jury. In overruling the defendant's contention, the court of criminal appeals expressly rejected the defendant's complaint about the trial court's deletion because the charge had been omitted upon the defendant's request. *Id.* at 532.

In the present case, Appellant requested the admission of the transcript. Appellant can not now complain on appeal that the trial court violated rule 605 based on evidence Appellant introduced. We understand that rule 605 specifically provides that a party need not object to the violation of the rule; however, application of the rule in a situation where the party not only failed to object to the trial court's testimony, but also requested it not once but twice is unjustifiable. *See Kelley,* 823 S.W.2d at 302 (holding appellant cannot invite error and then complain about it on appeal). We hold on the facts of this case, therefore, that Appellant is estopped from complaining on appeal of the admission of the testimony.

■■ Appellant also argues that the introduction of Judge Gill's testimony deprived him of a neutral and detached magistrate. Specifically, Appellant argues that his "substantive arguments concerning the warrants Judge Gill signed were not given any opportunity to be impartially weighed and considered" because Judge Gill also had to consider his own testimony in determining the outcome of the suppression motion. In fact, Appellant contends that "Judge Gill's ruling in light of all the offered evidence by Appellant in support of his suppression motion directly contradicted and diminished Appellant's position and gave the Judge the appearance of being aligned with the prosecution." However,

our discussion of invited error above also disposes of this contention. Appellant voluntarily introduced into evidence Judge Gill's testimony that he now contends on appeal "was clearly adverse to Appellant and gave the Judge the appearance of impropriety frowned on by the Constitution." Therefore, because Appellant specifically introduced Judge Gill's testimony into evidence, we conclude that he is barred from complaining on appeal that such inclusion denied him of a fair and impartial magistrate. *See Kelley*, 823 S.W.2d at 302. Appellant's first point is overruled.

## IV. MOTION TO SUPPRESS

In his second point, Appellant argues that the trial court erred in denying his motion to suppress the fruits of his allegedly illegal detention on the grounds that: (1) Appellant's detention exceeded the scope of his arrest on an outstanding traffic warrant; (2) Appellant, due to his low intelligence quotient (I.Q.), did not knowingly, intelligently, and voluntarily waive his *Miranda* rights; (3) officials failed to cease interrogation after Appellant invoked his Fifth Amendment right to remain silent; (4) search and arrest warrants in the case were not issued by a neutral and detached magistrate; and (5) the trial judge who "arraigned" Appellant failed to appoint him counsel at the time of the "arraignment."

### A. SUPPRESSION FACTS

On August 13, 1999, authorities discovered that Appellant had an outstanding traffic warrant. After determining that the warrant was still open and valid, officials arrested Appellant at approximately 8:15 p.m. on August 17, 1999, as he was getting out of his car at a convenience store in south Fort Worth. Appellant was then transported to the special crimes section of the Tarrant County District Attorney's Office and placed in a room for questioning.

Danny McCormick, an investigator with the Tarrant County District Attorney's Office, explained to Appellant that he was being arrested on an outstanding traffic warrant. McCormick also told Appellant that he wanted to discuss the disappearance of Opal Jennings. Appellant agreed to take a polygraph and signed a consent to search his vehicle. McCormick then *Mirandized*[1] Appellant and had Appellant initial next to each warning to indicate that he understood his rights. No further questions or discussions were conducted until Eric Holden, the polygraph examiner, arrived.

When Holden arrived at the office at approximately 10:30 p.m., he talked to Appellant in order to determine whether he wanted to take a polygraph examination and whether he was capable of being tested. Holden determined that Appellant was "anxious" to take the polygraph and that he was rested and was capable of being tested. The investigators then briefed Holden for about thirty minutes on the case, after which Holden obtained Appellant's consent to proceed with the test.[2] Holden initiated the polygraph at 2:01 a.m. and concluded it around 2:30 a.m.

Appellant's polygraph test results indicated the possibility of deception on Appellant's part. Therefore, around 3:00 a.m., Holden informed Appellant of the results and asked him to explain his position. As Appellant told his story, Holden wrote five pages of notes. After about two and one-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. The written consent form, while not required by law, included, among other things, Appellant's *Miranda* rights.

half hours, Appellant told Holden that he was tired and did not want to talk anymore; therefore, Holden terminated the conversation and showed Appellant the notes that he had taken to confirm that he had memorialized their discussion correctly. Appellant noted the veracity of Holden's notes on the last page in his own handwriting. Holden then left the room and gave his notes to McCormick who had them transcribed. During this process, McCormick asked Appellant if he would allow McCormick to read the typed version of Holden's notes to him to see if he agreed with it, which Appellant agreed to do. McCormick then took the typed statement to Appellant for his approval. McCormick read the *Miranda* warnings contained at the top of the typed statement to Appellant, stopping after each warning and asking if he understood them. McCormick testified that Appellant indicated that he understood each of his *Miranda* rights and nevertheless waived them. McCormick then read the statement to Appellant, which Appellant signed at 8:00 a.m. with only one correction.

Arrangements were made to take Appellant before a judge. While he was being transported, Appellant told the officials that words had been put in his mouth and he had not done the things contained in the statement that he had signed. McCormick then asked Appellant if his statement was true, and Appellant answered that it was. The officials then obtained an arrest warrant for the aggravated kidnapping of Opal Jennings, and Appellant was "arraigned" on those charges.[3] While Appellant was waiting to appear in court he began recanting his statement, only to later reaffirm his statement's truthfulness.

Appellant filed several pretrial motions to suppress his written statement and arrest warrant, as well as any oral statements he made during his detention. During the hearing on these motions, Dr. Daniel Lowrance testified that he gave Appellant a Wechsler Adult IQ test approximately three months before the suppression hearing that indicated that Appellant had an IQ of 64, which fell within the first percentile. Because Appellant's IQ fell below the two-percent range, Dr. Lowrance concluded that Appellant suffered from a mild mental deficiency. He explained specifically that while Appellant had graduated from high school through the special education department, Appellant's mental age was equivalent to a ten- or eleven-year-old child. Dr. Lowrance conceded during cross-examination, however, that the real-world experiences of a thirty-year-old man would be significantly different from those of a ten-year-old child.

At the close of the hearing, the trial court made the following oral findings of fact, which it ultimately reduced to written form:

- The arrest warrant that led to Appellant's initial detention was valid and was signed by a neutral and detached magistrate;

---

3. Judge Gill testified during the hearing on Appellant's motion to recuse him that Appellant's appearance before him on the morning following his arrest on the outstanding traffic warrant and interrogation constituted an arraignment instead of a preindictment appearance. Statutory authority and caselaw seem to limit an arraignment to the identification of an accused and entry of his plea to the State's charging instrument. TEX CODE CRIM. PROC. ANN. art. 26.02 (Vernon 1989). In fact, the code of criminal procedure provides that "[n]o arraignment shall take place until the expiration of at least two entire days *after the day* on which *a copy of the indictment was served on the defendant.*" *Id.* art. 26.03 (emphasis added). However, we will save our discussion of this issue for further development under Appellant's discrete subpoint that relies on this testimony.

- Appellant's statement was voluntarily given;
- The *Miranda* warnings and waivers were legally sufficient under article 38.22 of the code of criminal procedure;
- There was no causal connection between the State's failure to take Appellant before a magistrate and the resulting statement;
- Appellant's statement "I want to stop, I'm tired" was an ambiguous request to terminate the interview and Mr. McCormick merely followed up on Appellant's request to see if Appellant was actually invoking his Fifth Amendment right; and
- Appellant did not invoke his Fifth Amendment right.

The trial court consequently overruled Appellant's motion to suppress.

### B. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress evidence, an appellate court should give great weight to the inferences drawn by the trial court and law enforcement officers. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *Davis v. State,* 989 S.W.2d 859, 862 (Tex. App.-Austin 1999, pet. ref'd). The trial court is the sole trier of fact and the judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App. 2000). Thus, the trial court is free to believe any or all of a witness's testimony. *Id.; Allridge v. State,* 850 S.W.2d 471, 492 (Tex.Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

The court of criminal appeals has provided three standards of review to be applied in reviewing a trial court's denial of a motion to suppress evidence. *Guzman,* 955 S.W.2d at 89. We must afford almost total deference to the trial court's deter-mination of the historical facts that the record supports when the trial court's findings are based on an evaluation of credibility and demeanor. *Id.* Likewise, we are to utilize the same deference in reviewing the trial court's ruling on mixed questions of law and fact when the resolution of the questions turns on an evaluation of credibility and demeanor. *Id.* However, we review de novo mixed questions of law and fact that do not fall within the preceding two categories. *Id.* In other words, we review de novo "mixed questions of law and fact" that do not turn on a witness's credibility and demeanor. *Id.*

### C. VOLUNTARINESS

■ Appellant argues that the trial court erred in concluding that his statement was voluntarily given in compliance with Article 38.22 of the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979 & Supp. 2002). Appellant does not dispute the fact that he was given and signed or initialed several *Miranda* warnings; he alleges instead that there was no showing that he understood the consequences of his waiver of his rights due to his mental impairment. Whether, due to Appellant's diminished mental capability, he was unable to understand the consequences of his waiver of his *Miranda* rights is a mixed question of law and fact. Therefore, because the resolution of this question involved the evaluation of the credibility and demeanor of the witnesses, we review the record applying an abuse of discretion standard of review. *Guzman,* 955 S.W.2d at 89.

■ Article 38.21 of the code of criminal procedure provides that a statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion. TEX.CODE CRIM. PROC. ANN.

art. 38.21 (Vernon 1979); *Penry v. State,* 903 S.W.2d 715, 744 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). Article 38.22, section 2(b) specifies that no statement made by an accused as a result of custodial interrogation may be admissible unless the accused "prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived" the warnings prescribed by section 2(a). TEX.CODE CRIM. PROC. ANN. art. 38.22. The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition. *Penry,* 903 S.W.2d at 744; *Reed v. State,* 59 S.W.3d 278, 281 (Tex.App.-Fort Worth 2001, pet ref'd).

▪ An inquiry into the waiver of *Miranda* rights has two distinct dimensions. First, the waiver must be voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)); *Ripkowski v. State,* 61 S.W.3d 378, 384 (Tex. Crim.App.2001). Second, the waiver must be made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. *Spring,* 479 U.S. at 573, 107 S.Ct. at 857 (citing *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)); *Ripkowski,* 61 S.W.3d at 384.

Appellant does not contend that he was coerced or intimidated into giving the statement at issue. Instead, he argues that due to his mental impairment, he was not aware of the consequences of waiving his *Miranda* rights. Consequently, we will focus our discussion on the second inquiry into the validity of his waiver of *Miranda* rights.

▪ While not alone determinative, mental impairment is a factor in ascertaining the voluntariness of a confession. *Penry,* 903 S.W.2d at 744; *Bizzarri v. State,* 492 S.W.2d 944, 946 (Tex.Crim.App. 1973); *Reed,* 59 S.W.3d at 281. In essence, the question is whether the accused's mental impairment is so severe that he was incapable of understanding the meaning and effect of his statement. *See Casias v. State,* 452 S.W.2d 483, 488 (Tex. Crim.App.1970); *Reed,* 59 S.W.3d at 281–82.

The court of criminal appeals has repeatedly upheld the voluntariness of confessions given by defendants with mental deficiencies. *See Penry,* 903 S.W.2d at 745–46 (appellant's IQ ranged from the forties to the seventies and appellant could not read or write); *White v. State,* 591 S.W.2d 851, 858–59, 860 (Tex.Crim.App. 1979) (appellant's IQ was measured at 75, 84, and 86 and he was considered "borderline mentally retarded"), *overruled on other grounds by Bigby v. State,* 892 S.W.2d 864 (Tex.Crim.App.1994); *Bell v. State,* 582 S.W.2d 800, 809 (Tex.Crim.App.1979) (appellant was "mildly retarded"), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981); *Nash v. State,* 477 S.W.2d 557, 563–64 (Tex.Crim.App.) (holding that a defendant with an IQ of 76 and intelligence-emotional level of a twelve-year-old was capable of waiving his rights), *cert. denied,* 409 U.S. 887, 93 S.Ct. 191, 34 L.Ed.2d 144 (1972); *Casias v. State,* 452 S.W.2d 483, 488 (Tex.Crim.App.1970) (appellant had an IQ of 68 with a mental age of eight to ten years of age and had an educational equivalent of approximately second grade); *Grayson v. State,* 438 S.W.2d 553, 555–56 (Tex.Crim.App.1969) (appellant had an IQ of 51 and was classified as a "low-grade moron").

While Dr. Lowrance testified that Appellant had an overall IQ of 64, he never

testified that Appellant was incapable of understanding his *Miranda* warnings or understanding the effect of their waiver. Instead, Katherine Manning, an investigator with the Tarrant County District Attorney's Office, testified that Appellant was read his *Miranda* warnings by McCormick shortly after Appellant arrived at the Tarrant County District Attorney's Office and gave his consent to search his vehicle. After each individual warning, McCormick stopped and asked Appellant if he understood, and Appellant indicated that he did. Appellant also initialed each warning. McCormick further testified that he had no trouble communicating with Appellant. Holden, who also gave Appellant written *Miranda* warnings in a written release necessary to continue the polygraph examination, testified that, while he was told before starting his examination that Appellant was a slow learner, he believed that Appellant understood the subject matter of their conversation. Consequently, Appellant never indicated that he did not understand the warnings.

Appellant's evidence that he was "mildly mentally deficient" does not, standing alone, render his statement involuntary. *See Penry*, 903 S.W.2d at 746; *White*, 591 S.W.2d at 858; *Casias*, 452 S.W.2d at 488; *Grayson*, 438 S.W.2d at 555. Therefore, because Appellant failed to provide any evidence that he was coerced or intimidated into giving his statement, and because Appellant provides this court with no evidence that he did not understand his rights or the consequences of abandoning them, we hold that the trial court did not abuse its discretion in overruling Appellant's motion to suppress his statement and the arrest warrant that relied on it.

### D. INVOCATION OF APPELLANT'S RIGHT TO REMAIN SILENT

██ Appellant also contends that his statement was illegally obtained in violation of *Miranda v. Arizona*, 384 U.S. at 479, 86 S.Ct. at 1630, because his right to silence, once invoked, was not "scrupulously honored." Specifically, he argues that his statement—"I don't want to talk anymore. I'm tired."—invoked his Fifth Amendment right to remain silent and that McCormick's continued questioning of him after this invocation violated his rights. When faced with this argument at trial, the trial court specifically found that Appellant's statement that he was tired and did not want to talk was "at best, an ambiguous request to terminate the interview and that the officers validly followed up on that request to see if the Defendant was, in fact, invoking a Fifth Amendment right." Because this is a mixed question of law and fact whose resolution turns on credibility and demeanor, we review the trial court's ruling for an abuse of discretion. *Guzman*, 955 S.W.2d at 89.

██ A failure to cut off custodial questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible. *Michigan v. Mosley*, 423 U.S. 96, 100–01, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Crim.App. 1996). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Dowthitt*, 931 S.W.2d at 257. But an officer need not stop his questioning unless the suspect's invocation of his right is unambiguous, and the officer is not required to clarify ambiguous remarks. *Davis v. United States*, 512 U.S. 452, 458–61, 114 S.Ct. 2350, 2355–56, 129 L.Ed.2d 362 (1994); *see also Dowthitt*, 931 S.W.2d at 257; *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995).

The court of criminal appeals has specifically explained that words may not be necessary to invoke a defendant's right to remain silent under *Miranda* because *Miranda* makes clear that the interrogation must cease when the person in custody "indicates in any manner" that he wishes to remain silent. *Watson v. State,* 762 S.W.2d 591, 597 (Tex.Crim.App.1988). In fact, the court concluded that there need not be a formal invocation of *Miranda* rights; instead, anything said or done by the defendant that could reasonably be interpreted as a desire to invoke these rights should be sufficient to halt questioning. *Id.* at 598; *Faulder v. State,* 611 S.W.2d 630, 640 (Tex.Crim.App.1979), *cert. denied,* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980). As such, the court of criminal appeals, while recognizing that an express assertion of a right to remain silent is desirable, concluded that an express invocation of the right is not required. *Watson,* 762 S.W.2d at 599. Therefore, the court of criminal appeals determined that the defendant's silence and refusal to answer questions, coupled with the police officers' appreciation of the defendant's wishes was sufficient to invoke the defendant's right to remain silent. *Id.*

Nevertheless, eight years later, in a case similar to the one at hand, the court of criminal appeals held that a similar statement to the one in question had failed to unambiguously invoke the defendant's Fifth Amendment right. *See Dowthitt,* 931 S.W.2d at 257. The court of criminal appeals specifically held that the defendant's statement, "I can't say more than that. I need to rest," merely indicated that he believed he was physically unable to continue, not that he wanted to quit. *Id.* We believe that this case is bound by the court of criminal appeals' decision in *Dowthitt* and Appellant's statement that he did not want to talk anymore, he was tired is ambiguous and was merely an indication that Appellant was physically unable to continue. In fact, in Appellant's own handwritten statement at the end of Mr. Holden's notes, Appellant stated that he "told Mr. Holden that *I am tired* and we stop [sic] the interview at my request." (Emphasis added). Because we conclude that Appellant's statement was ambiguous, we hold McCormick did not violate Appellant's rights by continuing the interrogation.

### E. UNNECESSARY DELAY

■ Appellant further contends that the State violated article 15.17 of the code of criminal procedure by failing to bring him before a magistrate within a reasonable time after arresting him on the traffic warrant. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 977, § 1, 1989 Tex. Gen. Laws 4053 (amended 2001) (current version at TEX.CODE CRIM. PROC. ANN. art. 15.17(a) (Vernon Supp.2002)). Consequently, Appellant argues that the delay tainted the written statement he gave during this delay that provided the basis for the arrest warrant for the aggravated kidnapping of Opal Jennings, thereby requiring the suppression of both the statement and the arrest warrant. Specifically, Appellant alleges that his detention became illegal when the State failed to take him to a magistrate to make arrangements for him to pay his traffic ticket.

We can find, however, no such request. While there is evidence that Appellant was "curious about how much it would cost to get out of jail," we can find no evidence that Appellant ever made any attempt to actually pay his ticket. Instead, Appellant not only agreed to discuss the Opal Jennings case with the investigators, but he also submitted to a polygraph examination without ever requesting to be taken before a magistrate or offering to pay his traffic ticket.

█ Appellant further seems to argue that because investigators lacked probable cause to arrest him for aggravated kidnapping, any delay in bringing him before the magistrate on the traffic violation was unreasonable because it allowed the investigators the opportunity to "partake in a classic 'fishing expedition' based on a 'hunch.'"

There was an approximate thirteen-hour delay in taking Appellant before a magistrate. While Appellant was arrested on an outstanding traffic warrant at 8:15 p.m. on August 17, 1999, he was not taken before a magistrate to be arraigned on aggravated kidnapping charges until approximately 9:30 a.m. on August 18, 1999. The court of criminal appeals has held that taking a defendant before a magistrate within approximately sixteen hours after his arrest satisfies the "without unnecessary delay" requirement of article 15.17(a). *Jenkins v. State*, 912 S.W.2d 793, 807–08 (Tex.Crim. App.1993) (op. on reh'g). Therefore, we hold that there was no unnecessary delay in taking Appellant before a magistrate after his arrest.

## F. Neutral and Detached Magistrate

█ Appellant further argues that: "[t]he arrest and search warrants for Appellant were not issued by a neutral and detached magistrate as required" by articles 15.01 and 18.01 of the code of criminal procedure; "[t]he issuance of said warrants was also not an intervening circumstance that attenuated the taint of Appellant's unlawful arrest;" and "[t]he warrants were not supported by probable cause." *See* Tex.Code Crim. Proc. Ann. art. 15.01, 18.01 (Vernon 1977 & Supp.2002). Appellant provides absolutely no argument in support of any of these assertions. He does direct us to "*see* APPELLANT'S 'FIRST POINT OF ERROR' FOR DETAILED DISCUSSION" in support of his attack on Judge Gill's neutrality and detachment. However, Appellant's first point addressed Judge Gill's failure to sua sponte recuse himself from Appellant's second trial after Appellant introduced Judge Gill's testimony from the hearing on Appellant's motion to recuse him before the first trial. Even this discussion lacks any argument as to Judge Gill's lack of neutrality or detachment at the time he signed the warrants. Therefore, we hold Appellant has failed to adequately brief this subpoint for our review. *See* Tex. R.App. P. 38.1(h) (providing that appellate briefs contain a clear and concise argument for the contentions made); *Jackson v. State*, 50 S.W.3d 579, 591 n. 1 (Tex.App.-Fort Worth 2001, pet. ref'd) (explaining that by raising an issue and failing to present any argument or authority on that issue, the party waives that issue).

## G. Appointment of Attorney at Arraignment

█ Appellant also argues that the trial court erred in overruling his motion to suppress when it failed to appoint him counsel to represent him during his arraignment the morning following his arrest on an unrelated outstanding traffic warrant. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right does not attach, however, prior to the initiation of adversary judicial proceedings, which may be initiated by way of formal charge, preliminary hearing, indictment, information, or arraignment. *United States v. Gouveia*, 467 U.S. 180, 187–89, 104 S.Ct. 2292, 2297–98, 81 L.Ed.2d 146 (1984); *Green v. State*, 872 S.W.2d 717, 719 (Tex.Crim.App.1994). However, not every event following the inception of the proceedings is a "critical stage" that requires the presence of coun-

sel under the Sixth Amendment. *Green,* 872 S.W.2d at 720. In assessing whether a particular stage is critical, we examine the event "in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *United States v. Ash,* 413 U.S. 300, 313, 93 S.Ct. 2568, 2575, 37 L.Ed.2d 619 (1973); *Green,* 872 S.W.2d at 720.

Appellant argues that his "arraignment" the morning after his arrest on the traffic warrant became a "critical stage" for purposes of the Sixth Amendment's guarantee to counsel once the State filed a motion to seal Appellant's arrest warrant. We cannot agree with Appellant's characterization of his hearing as an arraignment. The code of criminal procedure provides that an arraignment occurs after the filing of formal charges. *See* TEX.CODE CRIM. PROC. ANN. art. 26.01 (Vernon 1989) ("In all felony cases, after indictment, ... there shall be an arraignment"); *Id.* art. 26.02 ("An arraignment takes place for the purpose of ... hearing his plea"); *Id.* art. 26.03 ("No arraignment shall take place until ... a copy of the indictment was served on the defendant"). No formal charges had been filed in this case at the time of the hearing in question. Instead, the evidence suggests that Appellant was brought before Judge Gill for purposes of receiving his article 15.17 warnings, which the court of criminal appeals has held does not constitute an "arraignment." Act of May 29, 1989, 71st Leg., R.S., ch. 977, § 1, 1989 Tex. Gen Laws 4053, 4053–54 (amended 2001) (current version at TEX.CODE CRIM. PROC. ANN. art. 15.17(a) (Vernon Supp. 2002)) (requiring the magistrate to inform the arrested person of the accusation against him, accusation contained in any affidavit filed, his right to have an examining trial, and his *Miranda* rights); *Watson v. State,* 762 S.W.2d 591, 594 n. 4 (Tex. Crim.App.1988) (explaining that an article 15.17 hearing is not an "arraignment" under Texas law).

We need not decide here whether adversary judicial proceedings commenced during Appellant's article 15.17 hearing, however. For even if this preindictment hearing was sufficient to mark the initiation of adversary judicial proceedings when the State requested the sealing of the arrest warrant, we can find no merit in Appellant's argument that this alleged error had any effect whatsoever on the voluntariness of his statement that he gave at least five hours earlier or on the arrest warrant itself. Appellant does not raise his argument in terms of the propriety of the hearing in and of itself; instead, Appellant couches his argument in terms of its relation to his motion to suppress. As such, because Appellant fails to explain how his failure to be granted counsel during the article 15.17 preindictment hearing affected the arrest warrant or his written statement, both of which had already come into existence before the hearing, Appellant has provided us with no evidence upon which we may conclude that the trial court abused its discretion in denying Appellant's motion to suppress. Appellant's second point is overruled.

## V. DENIAL OF MOTION FOR INSTRUCTED VERDICT

▮ In his third point, Appellant argues that the trial court erred in denying his motion for an instructed verdict. A challenge to the denial of a motion for an instructed verdict is actually a challenge to the legal sufficiency of the evidence. *Jackson v. State,* 50 S.W.3d 579, 597 (Tex. App.-Fort Worth 2001, pet. ref'd); *see also Madden v. State,* 799 S.W.2d 683, 686 (Tex.Crim.App.1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991). The standard of review for the legal sufficiency of the evidence to support

a conviction is the same for direct and circumstantial evidence cases. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App. 1999). In reviewing the legal sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict. *Cardenas v. State,* 30 S.W.3d 384, 389–90 (Tex.Crim.App.2000); *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex.Crim. App.), *cert. denied,* 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The legal sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *See Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991); *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim. App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). Our duty is not to reweigh the evidence from reading a cold record, but to act as a due process safeguard ensuring only the rationality of the fact finder. *Williams v. State,* 937 S.W.2d 479, 483 (Tex.Crim.App.1996). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson,* 819 S.W.2d at 846.

Appellant specifically complains on appeal that the trial court erred in overruling his motion for an instructed verdict because the State failed to prove the corpus delicti for the offense of aggravated kidnapping beyond a reasonable doubt. The corpus delicti rule is a rule of evidentiary sufficiency that can be summarized as follows: an extrajudicial confession of wrongdoing, standing alone, is not enough to support a conviction; there must exist other evidence showing that a crime has in fact been committed. *Rocha v. State,* 16 S.W.3d 1, 4 (Tex.Crim.App. 2000); *see also Williams v. State,* 958 S.W.2d 186, 190 (Tex.Crim.App.1997).

Appellant's statement, omitting the *Miranda* warnings, reads as follows:

On March 26, 1999, I went to Saginaw Texas to see my brother, [Danny], when I saw Opel [sic] Jennings and two other kids (a boy and a girl) playing in a field beside a house. This was about 4:00PM in the afternoon or a little later. I was driving a Ford Cougar, and was by myself. I went by Danny's house, saw the girls and a boy outside playing in the field. I stopped to talk to them and Opel [sic] said, "where are you going?" I was in the car and Opel [sic] was talking to me through the fence, she asked where I was going, and I told her that I was going to see if my brother was home so I could go visit with him. I told Opel [sic], "If he's not there, I'm going home." She said, "they might be at work," and I then asked her how she was doing and she said she was doing good in school. She said that she was getting good grades. She came up to the car on the driver's side, the driver's door was open, she came up to the door, gave me a hug, and shook my hand. I asked her if she was passing and she said "I hope so." I then told her that if she was doing good in school, then she would. I said, "I hope you pass." The other kids wanted her to hurry up so

she could play with them. I said, "you need to get back and finish playing what you'all are playing." They were playing some kind of ball. She reached in the car, I thought she was going to try and grab me, I didn't know what she was going to try to do, so I pushed her back and said, "what are you trying to do, I'm not the one to be doing it with." I didn't want to do nothing that would get me in trouble, she was just a kid. I don't see myself doing nothing like that. I was afraid she was going to make a pass at me or get me to take her somewhere. She was wanting me to take her to the store, she went around the front of the car to get in the passenger side. I was afraid she wanted me to take her to have sex with her or something. I took her to the store, she got in the passenger side, the other two kids were outside playing. I told her I was going to bring her back so she could finish playing with the other two kids. I took her to the convenience store a block from the house, I sat in the car, and she got something to drink.

She bought a coke, then she came back to the car, she said "thank you for bringing me up here," but I said, "I won't do it again." Opel [sic] tried to move over toward me, I didn't know what she tried to do. She tried to grab me between the legs, she grabbed my dick. She wanted me to fuck her, I told her no. She said "fuck me." She tried to take her pants off, I told her "no." She asked me why and I said "because I don't do that." She asked me why and I said, "because you're too young and I could get in trouble for it." "She unzipped my pants, took my dick out, she had it in her hand, she went down like she was going to go down on it." I pushed her back, I put my dick back in my pants. She was sitting beside me, when she went to bend over I pushed

her back. I said "I'm not going to have sex with someone younger than I am." I told her that she needed to get out of the car, this happened on the way back from the store. I took her to her house, and left her off the same place where I talked to her at. I don't know if she went in the house or not. I just wanted to get away from her. When I dropped her off, she gave me a hug, and I left, the other two kids were in the field playing.

Aggravated kidnapping is defined as the intentional or knowing abduction of a person with the intent to inflict bodily injury on her or to violate or abuse her sexually. TEX. PENAL CODE ANN. § 20.04(a)(4) (Vernon Supp.2002). The penal code further defines "abduct" as:

> "restrain[t of] a person with intent to prevent his liberation by:
>
> (A) secreting or holding him in a place where he is not likely to be found; or
>
> (B) using or threatening to use deadly force."

*Id.* § 20.01(2). The court of criminal appeals has further explained that secretion and the use of deadly force are part of the mens rea element of abduction, rather than the actus reus. *Mason v. State,* 905 S.W.2d 570, 575 (Tex.Crim.App.1995), *cert. denied,* 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 670 (1996); *see also Brimage v. State,* 918 S.W.2d 466, 475–76 (Tex.Crim. App.1994), *cert. denied,* 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 66 (1996). Consequently, the basic elements of "abduct" are: (1) a restraint is made (2) with a specific intent to prevent liberation by either of two particular means. TEX. PENAL CODE ANN. § 20.01(2); *Brimage,* 918 S.W.2d at 475–76.

Because Appellant's statement contains no admission whatsoever that he took Opal

to the store with the intent to prevent her liberation by secreting her or holding her in a place where she was not likely to be found or by using or threatening to use deadly force, Appellant, through his statement, did not confess to abducting Opal. Furthermore, Appellant's statement fails to encompass any evidence of an intent on Appellant's part to inflict bodily injury on her or to violate or abuse her sexually or to terrorize her, which is the additional requisite mens rea element of aggravated kidnapping. TEX. PENAL CODE ANN. § 20.04(a)(4), (5); see also Chew v. State, 804 S.W.2d 633, 647 (Tex.App.-San Antonio 1991, pet. ref'd) (en banc op. on reh'g) (Butts, J., dissenting); White v. State, 702 S.W.2d 293, 294 (Tex.App.-Amarillo 1985, no pet.). As such, because the corpus delicti rule only precludes the use of extrajudicial confessions as the sole basis for conviction of a crime, and because we determine that Appellant's statement cannot be classified as a confession to aggravated kidnapping, we do not believe the corpus delicti rule is applicable to these particular facts. Accordingly, we will address Appellant's complaint as a simple challenge to the legal sufficiency of the evidence to support the elements of aggravated kidnapping.

As explained above, the essential elements of aggravated kidnapping are as follows: (1) a person; (2) intentionally or knowingly; (3) abducts; (4) another person with the intent to inflict bodily injury on her or to violate or abuse her sexually. TEX. PENAL CODE ANN. § 20.04(a)(4). Unfortunately, the State's one hundred-page brief devotes only two pages of argument in support of the legal sufficiency of the evidence. We do recognize that the State focused its argument on the establishment of the corpus delicti of aggravated kidnapping, which does not require the showing of all the statutory elements of the offense,

including the identity of the perpetrator. See Gribble v. State, 808 S.W.2d 65, 70 (Tex.Crim.App.1990), cert. denied, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991). However, the only evidence the State points to in support of the sufficiency of the evidence is the four-year-old eyewitness's recollection that the perpetrator was a long-haired man wearing a red baseball cap who picked up Opal, hit her in the chest, and threw her in his car.

Nevertheless, our own thorough evaluation of the record reveals the following additional facts that constitute legally sufficient evidence. In an effort to prove that Appellant abducted Opal, the State relied on five primary pieces of evidence: (1) the similarities between Appellant's car and the description of the kidnapper's car given at the scene; (2) witnesses' descriptions of Appellant as wearing a long ponytail and a red baseball cap before the day of the abduction; (3) Appellant's statement that he had contact with Opal the day she disappeared; (4) the recollection of allegedly incriminating statements Appellant made while in jail; and (5) Appellant's knowledge of Opal's neighborhood.

### A. APPELLANT'S CAR

Three witnesses from Opal's neighborhood testified that they had observed a suspicious car driving through the neighborhood before the abduction. When shown a photograph of Appellant's 1986, black, two-door, Mercury Cougar with a black, vinyl half-roof, the three witnesses testified that the car they saw was "very similar," "real similar," and "similar" to Appellant's car. The two witnesses who testified that Appellant's car was "very similar" and "real similar" to the car they saw explained that they were not testifying that Appellant's car was the car they actually witnessed driving through the neighborhood. Further, while the third witness

could testify that Appellant's car was "similar" to the one he saw the night of Opal's abduction, he could not say it was the same car. He described the car he saw as a medium-sized, "real dark purple" car with "very dark tinted windows" and "shiny wheels" that sat higher in the front than it did in the back, which was not the appearance of Appellant's car five months after the abduction. However, he testified that he observed the car during sunset, which could have caused it to look purple. He also ended his testimony by explaining that Appellant's car could have been the one he saw.

Four-year-old Spencer, Opal's friend, also described the car the abductor was driving. Unfortunately, however, Spencer failed to give a consistent description. Throughout the investigation, Spencer said that the abductor's car was "purpledy-black," purply-pink, and a "dark car," which Spencer's grandmother testified ran the gamut from black to dark blue. He also told his grandmother that the car was either high in the front or in the back. Spencer also attempted to describe the type of car the abductor was driving. At the scene, Spencer said that the car he saw was similar to his mom's car, a black Trans Am, but he said it was not just like it. He also saw a black Chrysler car, possibly a Cougar, drive by after the abduction, which he said looked like the one the abductor was driving.

### B. Appellant's Appearance

Spencer further aided the investigators by giving them a description of the abductor, whom he described as a light or dark-skinned male with pimples, wrinkles, and long hair pulled back in a ponytail who was wearing a red baseball cap, dark short-sleeved T-shirt, dark pants, and dark sneakers. Spencer was not, however, consistent with his estimation of the age of the abductor. Spencer indicated the abductor's age by pointing to an officer who was between forty and forty-five years old. Later, Spencer indicated that the abductor was between twenty and sixty years old. At the time of his arrest on the outstanding traffic warrant, Appellant was thirty years old.

Six witnesses testified on behalf of the State about the length of Appellant's hair before and after the abduction and Appellant's propensity to wear a red baseball cap and his hair in a ponytail. This testimony revealed that Appellant "sometimes ... had [his hair] in a ponytail," that he had a "long ponytail," that his hair was "[o]ver the collar, long, and ... sometimes pulled back." The testimony also established that Appellant "always wore a baseball cap," "occasionally" wore a baseball cap, and wore a red baseball cap "all the time." Appellant also told one of his questioners on the night he was arrested that he wore red ball caps. The evidence also established that Appellant had short hair shortly after Opal's abduction. One witness testified that when he met with Appellant six days after Opal's disappearance, Appellant had really short, clean-cut hair, unlike he had ever seen on Appellant, while another testified that she never saw Appellant wear a red hat again.

In support of Spencer's description of the abductor as having marks on his face, the State also introduced a picture of Appellant, which one witness testified showed Appellant with what appeared to be "pimples or something like that on the side of his face." The defense, however, introduced evidence that when Spencer was shown a picture of Appellant on television, he said that Appellant was not the abductor. The State pointed out, though, that the picture of Appellant on television did not show Appellant with long hair or wearing a red baseball cap.

### C. APPELLANT'S STATEMENT

The State also relied on the statement Appellant gave at the district attorney's office on the night of his arrest on the outstanding traffic warrant as evidence of Appellant's guilt. On appeal, Appellant points us to the inaccuracies in his statement when read in conjunction with the facts adduced at trial. While Appellant explained in his statement that he talked to Opal through a fence, there was no fence on the property on the day of the abduction. Instead, the fence was erected after the abduction.

The State elicited testimony, however, that other than the fence, all of the other facts contained in Appellant's statement capable of being confirmed were consistent with the actual events of Opal's abduction. Specifically, the statement was consistent with the actual events with regard to the place where the children were playing, the time of day, and the general description of the car.

Holden also testified that when he accused Appellant of killing Opal on the night Appellant was arrested, Appellant's interview was terminated when he complained about being tired, which Holden testified he took as Appellant's attempt to shut him out because he was getting too close. Lori Keefer, a special agent with the FBI, also explained that the morning after Appellant gave his statement, she and McCormick provided Appellant with a false scenario about another kidnapping. According to Keefer, Appellant became very agitated and said he did not do it. Keefer testified that Appellant told them that he knew that if he admitted to contact with Opal then he would get blamed for every similar crime that happened.

### D. JAILHOUSE STATEMENTS

Several inmates and jailers who became acquainted with Appellant during his con-finement in the Tarrant County Jail also testified on behalf of the State about several statements Appellant made while in jail. Robert Wood, a jailer, testified that Appellant told other inmates that he had taken Opal to the store and dropped her off somewhere else. According to Wood, Appellant also told them that the State could not convict him because they did not have a body. In addition, Wood testified that Appellant told him he knew it was wrong to take Opal to the store and drop her back off, but he did not know how the State was going to convict him without a body. Roger Polson, another jailer, testified about a similar conversation he had had with Appellant in which Appellant told him that he did not kidnap Opal, he just took her to the store and dropped her back off. James Blackburn, a trustee inmate who cleaned Appellant's cell one morning, also testified that Appellant told him that Appellant and his wife had heard that there had been an abduction in the neighborhood so they drove past Opal's house to see how close it was. Appellant believed that he was picked up because the police saw his car in the area after the abduction. Blackburn also testified as follows:

> [STATE:] ... Did he later tell you anything else?
>
> [BLACKBURN:] Yes, ma'am, he did.
>
> [STATE:] What did he tell you?
>
> [BLACKBURN:] Then he said he's been stalking her for about a year and he decided to go over to her house to get satisfied. And then after that, he picked her up, took her down the road to a fast-food place and when he got her out of the vehicle to take her inside, she started screaming. So he put her back in the [car] and he said that he went to go take care of her and he said after 15 or 20 minutes, she was gone.
>
> ....

[STATE:] Can you describe for the ladies and gentlemen his demeanor when he said this?

[BLACKBURN:] The way I took it, that he meant to go have sex with her.

Andrew Bouyer, an inmate, testified that Appellant told him that he had picked up Opal in a dark blue or black car and had taken her out to eat, but when she offered to have sex with him, he dropped her off. Appellant also told Bouyer that the authorities would never find Opal, which Bouyer testified Appellant was concerned about because it could have linked him back to the crime.

### E. APPELLANT'S KNOWLEDGE OF OPAL'S NEIGHBORHOOD

The State also relied on evidence that established Appellant's knowledge of Opal's neighborhood. The evidence shows that from 1989 until December 1998 Appellant's half-brother lived approximately one hundred feet from the vacant lot where Opal was abducted. During this time, a witness saw Appellant at his half-brother's house about ten times, the last being in August or September 1998. His half-brother testified that Appellant had last visited him at that address around June 1998.

### F. SUFFICIENCY

After a careful review of the record, we believe that a rational trier of fact could have found beyond a reasonable doubt that Appellant abducted Opal with the intent to inflict bodily injury on her and violate or abuse her sexually. The direct evidence in the record suggests that Appellant had contact with Opal on the day in question. Wood, Polson, and Bouyer all testified that Appellant picked Opal up on the day of the abduction with the intent, according to Appellant's conversation with Blackburn, "to get satisfied," which Blackburn interpret-

ed as to have sex with Opal. Moreover, Bouyer testified that Appellant was concerned about the possibility of Opal's body being found because it could link him to the crime. Therefore, all of this evidence, coupled with the similarities between Appellant's appearance prior to Opal's disappearance and the description of the abductor, as well as the likeness Appellant's car shared with the description of the abductor's car, supports the essential elements of aggravated kidnapping.

Viewing all the evidence in the light most favorable to the State and giving full play to the responsibility of the trier of fact to resolve fairly conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson,* 443 U.S. at 318, 99 S.Ct. at 2788–89. Consequently, we overrule Appellant's third point.

## VI. MISTRIAL

 Appellant contends in his fourth point that the trial court erred in denying his motion for mistrial because of the State's concealment of evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and jury misconduct. Mistrials are an extreme remedy for curing prejudice occurring during trial. *Bauder v. State,* 921 S.W.2d 696, 698 (Tex.Crim.App.1996). They ought to be exceedingly uncommon and employed only when less drastic remedies are inadequate to the task of removing residual prejudice. *Id.*

### A. BRADY VIOLATION

With this in mind, we turn to the question of whether the trial court was required to grant Appellant's motion for mistrial based on evidence that child sex-

ual abuse allegations had been made concerning Opal's residence. Appellant argues that the State withheld critical exculpatory evidence concerning child sexual abuse allegations at Opal's residence and the existence of pornography on the family's computer. In answering this question, we examine the due process requirements of *Brady*.

Under *Brady*, in order to ensure the accused a fair trial, a prosecutor has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to turn over to the accused all exculpatory or impeachment evidence, irrespective of the good faith or bad faith of the prosecution, which is favorable to the defendant and is material to either guilt or punishment. *Kyles v. Whitley*, 514 U.S. 419, 432–33, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. This duty attaches as soon as the information comes into the prosecutor's possession, with or without. a request from the defense for such evidence, and the information must be disclosed to the accused in time to put it to effective use at trial. *See Palmer v. State*, 902 S.W.2d 561, 563 (Tex.App.-Houston [1st Dist.] 1995, no pet.); *Givens v. State*, 749 S.W.2d 954, 957 (Tex.App.-Fort Worth 1988, pet. ref'd).

A due process violation occurs if: (1) the prosecutor fails to disclose evidence; (2) the evidence is favorable to the defendant; and (3) the evidence is material. *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex.Crim.App.1993). Favorable evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *Thomas*, 841 S.W.2d at 404. Therefore,

the essential issue is whether there is a reasonable probability that, had the suppressed evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Thomas*, 841 S.W.2d at 404.

During the hearing on Appellant's motion for mistrial, Leanne Schenk, a former Child Protective Services investigator, testified that she had received information after the abduction about the possible existence of child pornography on a computer in Opal's home and that a female and a male who had either been involved in or convicted of child molestation were frequenting, visiting, or living in the home. Schenk testified without the benefit of her records. Therefore, she was not certain whether there was an additional person under suspicion of molestation at the residence. She testified, however, that she conducted an investigation into the allegations without searching the computer for pornography and determined that the pornography allegation was unfounded. Further, Leon Haley, Appellant's lead counsel at trial, testified that he not only had received the names of the two alleged child molesters, he had also used the information in Appellant's trial. In any case, Haley explained that he was concerned about the allegation of pornography on the computer and the possibility that there may have been other molesters at the residence. Following the hearing, the trial court concluded as follows:

> I find that with regard to the so-called testimony that wasn't turned over, that all of the concrete information was turned over by the State to the defense and was, in fact, acted upon during trial and the Defendant used that information to cross-examine State's witnesses.
>
> All there is remaining beyond that point is speculation that there may have been persons other—that were child

abusers in and out of that home around the date in question, which the evidence does not bear out, including the CPS records that I have reviewed at some length. There was no other persons that had access to that home at the time in question.

 Our threshold concern in evaluating a *Brady* claim is whether the favorable evidence was suppressed or withheld by the State or its agents. *Juarez v. State*, 439 S.W.2d 346, 348 (Tex.Crim.App. 1969); *Smith v. State*, 840 S.W.2d 689, 693 (Tex.App.-Fort Worth 1992, pet. ref'd). Appellant failed to satisfy this threshold requirement in regard to the identity of the specific sexual offenders at Opal's residence. It is undisputed that Appellant had personal knowledge of their identity and that his counsel used this information in cross-examining the State's witnesses. As such, the trial court did not abuse its discretion in failing to grant Appellant's motion for mistrial on this ground. *See Havard v. State*, 800 S.W.2d 195, 204–05 (Tex.Crim.App.1989) (defendant was aware that he had given a statement prior to trial and the contents of that statement); *Molinar v. State*, 910 S.W.2d 572, 583 (Tex. App.-El Paso 1995, no pet.) (defendant had evidence in his possession prior to trial). Therefore, the only other evidence that could be the subject of a *Brady* violation is the evidence of the possibility of pornography on the computer and additional molesters visiting Opal's home.

 Evidence is exculpatory where it negates a defendant's guilt or mitigates the offense. *Ex parte Dixon*, 964 S.W.2d 719, 723 (Tex.App.-Fort Worth 1998, pet. ref'd). We find nothing in the record to indicate that the State withheld exculpatory evidence. The only evidence concerning the possibility that the computer in Opal's home contained pornography is Schenk's testimony that she investigated

the matter and determined that the allegation was unfounded. It is true that she did not conduct a physical inspection of the computer itself, and instead relied on discussions with Opal's cousin. Nevertheless, the State introduced evidence during the hearing on Appellant's motion for mistrial that the computer at issue was not even in the home when Opal was kidnapped. Specifically, Andrew Farrell, a special agent with the FBI, testified as follows:

> [State:] First of all, can you tell Judge Gill when Audrey Sanderford, in fact, got a computer?
>
> [WITNESS:] Subsequent to the abduction, Audrey Sanderford contacted us at the command post and advised that someone was willing to donate a computer to her, to the family, at the victim's residence so that she would be able to track postings on the Internet with regard to Opal Jennings' disappearance. And we talked about it at the command post and thought that would not be a problem. And the computer was donated by a named person, I can't remember her name now, and installed there at the home, I would say the week after the abduction.
>
> [STATE:] So there was no computer—are you relatively satisfied that there was no computer in the home of Audrey Sanderford on or about March 26th, 1999?
>
> . . . .
>
> [WITNESS:] Yes, there was not a computer prior to the abduction.

Appellant, however, cross-examined Farrell as follows:

> [DEFENSE COUNSEL:] Now, Agent Farrell, you don't know from your own personal knowledge that there wasn't a computer in that house before you were called that day, do you?

[WITNESS:] Prior? I have no knowledge of it prior to the abduction. I know the day of the abduction there was not a computer there at the house.

[DEFENSE COUNSEL:] How do you know that?

[WITNESS:] Talking to the agents that responded to that residence.

[DEFENSE COUNSEL:] So you don't know that, do you?

[WITNESS:] Not directly, no.

. . . .

[DEFENSE COUNSEL:] So you don't know if there was a computer in the attic and they [the officers who executed a search of the home] just didn't pay attention to it, you wouldn't know that.

[WITNESS:] Well, no.

In light of the fact that there is no proof that a computer was even in the home before Opal was kidnapped, we cannot conclude that the *pornography* evidence negates or mitigates Appellant's guilt. Therefore, we hold such evidence was not exculpatory.

Appellant also expressed concern about not knowing about the possibility that "there may have been other molesters" at Opal's home. All of this "evidence" is mere speculation. However, even if this evidence were true, it would not negate or mitigate Appellant's guilt for Opal's kidnapping.

■ Furthermore, even if this evidence were exculpatory or possessed impeachment value, there is no evidence from the record that it would be material. Evidence withheld by a prosecutor is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. This evidence would only benefit Appellant in that

it could be used to suggest the possibility of a different abductor. However, Appellant's counsel pursued this defense in his cross-examination of the State's witnesses. In particular, Appellant's counsel cross-examined Farrell about a report by a woman jogging in Opal's neighborhood at the approximate time Opal was taken that a Hispanic man with dark hair in a pony-tail wearing black, Adidas pants and a black T-shirt and driving a dark brown car with chrome decorative hubcaps, tinted windows, and a vinyl brown roof stopped her and asked for directions to the freeway. This description largely matched Spencer's description of the abductor and his car; therefore, through cross-examination, the defense suggested that this person could be the actual abductor. The defense further cross-examined Farrell about myriad other suspects in the case. However, the jury discounted this testimony in order to convict Appellant. Given this, we cannot agree that the addition of further speculative evidence about the existence of pornography on the household computer, which the CPS investigator ruled groundless, and the possibility of other sex offenders visiting Opal's house would render a different outcome reasonably probable. As such, we conclude that the evidence in question was not material and, therefore, was not required to be disclosed pursuant to *Brady*.

### B. Outside Influence on Jury Deliberation

■ Appellant next asserts under his fourth point that the trial court erred in denying his motion for mistrial based on jury misconduct. We review the trial court's denial under an abuse of discretion standard. *Ex parte Bauder*, 974 S.W.2d 729, 731 (Tex.Crim.App.1998); *Moreno v. State*, 952 S.W.2d 44, 45 (Tex.App.-San Antonio 1997, no pet.). During a hearing

on his motion, Appellant introduced the testimony of Kim Sawyer, a juror who testified regarding the effect the trial court's *Allen* charge had on her deliberation.[4] Essentially, Appellant argues that the trial court coerced a verdict of guilty out of the jury and commented on the weight of the evidence.[5]

■ Rule 606(b) of the rules of evidence limits the situations about which a juror may testify in order to attack the validity of the verdict. TEX.R. EVID. 606(b). It specifically provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

*Id.* Essentially, this rule provides that a juror may not be allowed to impeach the validity of the verdict except in these two limited circumstances. *Id.* No one accused Sawyer of not being qualified to serve on the jury; therefore, the only issue rule 606(b) permitted Sawyer to testify about was whether any outside influence was involved in the verdict. *Id.*

■ Because the new rules of evidence took effect on March 1, 1998, there are very few criminal cases evaluating what constitutes "outside influence." Therefore, it is helpful to look to civil cases to attempt to define this term. *See In re S.P.*, 9 S.W.3d 304, 308 (Tex.App.-San Antonio 1999, no pet.); *Hines v. State*, 3 S.W.3d 618, 622–23 (Tex.App.-Texarkana 1999, pet. ref'd) (both looking to civil cases to determine outside influence in a criminal case). Civil cases have explained that to constitute "outside influence," the influence must emanate from outside the jury and its deliberations. *Blackmon v. Mixson*, 755 S.W.2d 179, 183 (Tex.App.-Dallas 1988, no writ). It has often been held in the civil context that information gathered by a juror and introduced to the other jurors by that juror does not add up to "outside influence," even if introduced specifically to prejudice the vote. *Soliz v. Saenz*, 779 S.W.2d 929, 932 (Tex.App.-Corpus Christi 1989, writ denied); *Baley v. W/W Interests, Inc.*, 754 S.W.2d 313, 316 (Tex.App.-Houston [14th Dist.] 1988, writ denied). Nor does coercive influence of one juror upon the rest of the panel constitute "outside influence." *Perry v. Safeco*

---

**4.** An *Allen* charge attempts to break a deadlocked jury by instructing that the result of a hung jury is a mistrial and that jurors at a retrial would be faced with essentially the same decision, and encouraging the jurors to try to resolve their differences without coercing one another. *Torres v. State*, 961 S.W.2d 391, 393 n. 1 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd).

**5.** Appellant also complains on appeal that Sawyer was unfairly pressured by the other jurors into voting guilty and that the jury was aware that Appellant was a registered sex offender, which "constitute[d] 'prejudicial extraneous information' that certainly qualifie[d] as an 'outside influence.'" However, these issues were not raised in the hearing on Appellant's motion for mistrial because the trial court specifically limited the scope of the hearing to the discussion the effect his *Allen* charge had on the jury's deliberations. Therefore, the only evidence available for review under Appellant's juror intimidation argument is Sawyer's affidavit attached to Appellant's motion for mistrial.

*Ins. Co.*, 821 S.W.2d 279, 281 (Tex.App.-Houston [1st Dist.] 1991, writ denied), *disapproved on other grounds by Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex.2000); *see also In re S.P.*, 9 S.W.3d at 309. Even a juror's injection of his own personal experiences, knowledge, or expertise will not be considered as an "outside influence" because such is said to emanate from inside the jury. *Soliz*, 779 S.W.2d at 932; *see also In re S.P.*, 9 S.W.3d at 309.

Sawyer testified in her affidavit that during the jury's deliberation ten jurors all agreed that Appellant was guilty. She explained that the other jurors were frustrated and wanted to go home and told her that she was being unreasonable and was crazy. Sawyer further expounded in her affidavit that she "finally just gave up and changed [her] vote." She clarified that she did not change her vote because she believed Appellant was guilty, but because of the other jurors' actions.

There is no evidence that anyone physically threatened or bribed Sawyer to vote guilty, and she never expressed that she did not actually agree with the jury's verdict after the verdict was given and the jury was polled. In fact, Sawyer expressed agreement with the guilty verdict directly after the verdict was read. Instead, Appellant's complaint merely alleges that she was coerced into voting guilty. However, we believe that this evidence only relates to influences that came to bear inside the jury room as part of its deliberations and cannot constitute an outside influence. *See, e.g., Perry*, 821 S.W.2d at 281 (concluding that coercive activity in the jury room did not amount to an outside influence). Therefore, Sawyer was prohibited by rule 606(b) from providing any evidence that her vote was influenced by coercion. Consequently, the trial court did not abuse its discretion in determining that

Sawyer's vote was free of outside influence and voluntarily given and did not err in denying Appellant's motion for mistrial on this point.

▮ Appellant also argues, however, that the trial court should have viewed the *Allen* charge as the outside influence which was improperly brought to bear upon the jury. We believe rule 606(b) also forecloses Sawyer's ability to provide evidence on the impact the trial court's *Allen* charge had on Sawyer's deliberation. The evidence shows that after the charge was read to the jury and the jury retired to deliberate, the jury sent the trial court a note explaining that they were unable to come to a unanimous vote. Therefore, the trial court decided to read an *Allen* charge to the jury and send them back to continue their deliberations. It is the content of this charge that Appellant complains coerced Sawyer to change her vote to guilty.

The proceedings relevant to the trial court's *Allen* charge are as follows:

THE COURT: Ladies and gentlemen, I'm in receipt of your latest note and I need to make an inquiry at this time.

Mr. Haynes, are you the foreperson of the jury?

THE FOREPERSON: Yes, sir, I am.

THE COURT: Mr. Haynes, without telling me what the numbers mean, could you tell me numerically what the split of the jury is at this point?

THE FOREPERSON: 10 to 2.

THE COURT: All right. I have a supplemental instruction to read to you at this time, ladies and gentlemen.

Members of the jury, you are instructed that in a large proportion of cases, absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of other

jurors, each juror should show a proper regard to the opinion of the other jurors.

You should listen with a disposition to being convinced to the arguments of the other jurors. If a large number of jurors are for deciding the case one way, those in the minority should consider whether they are basing their opinion on speculation or guesswork and not on the evidence in the case. Those in the minority should keep in mind the impression the evidence has made on a majority of the jurors who are of equal honesty and intellect as the minority.

If this jury finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury. The indictment will still be pending and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be impaneled in the same way this jury has been impaneled and will likely hear the same evidence which has been presented to this jury. The questions to be determined by that jury will be the same questions confronting you and there is no reason to hope the next jury will find these questions any easier to decide than you have found them.

With this additional information, you are instructed to continue deliberations in an effort to arrive at a verdict that is acceptable to all members of the jury, if you can do so without doing violence to your conscience.

You will now retire to the jury room and continue your deliberations.

Appellant provides us with no authority analyzing the effect of an *Allen* charge on jury deliberations as an outside influence for purposes of rule 606(b). Instead, we note that our Austin sister court has held that jurors were precluded from testifying about their misinterpretation of the trial court's statutory instructions under rule 606(b). *See Sanders v. State,* 1 S.W.3d 885, 886, 888 (Tex.App.-Austin 1999, no pet.); *see also Moody v. EMC Servs., Inc.,* 828 S.W.2d 237, 243 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Furthermore, the Dallas court specifically determined in the civil domain that the effect of an *Allen* charge did not constitute evidence of an outside influence and, therefore, precluded testimony under rule 606(b). *See Golden v. First City Nat'l Bank,* 751 S.W.2d 639, 643–44 (Tex.App.-Dallas 1988, no writ). The Fifth Circuit has also reached the same conclusion under rule 606(b) of the federal rules of evidence.[6] *United States v. Wickersham,* 29 F.3d 191, 194 (5th Cir.1994) (concluding that jury's interpretation of *Allen* charge was inadmissible); *see also United States v. Tines,* 70 F.3d 891, 898 (6th Cir.1995) (explaining that a "jury's interpretation

6. Federal rule 606(b) is broader than the Texas version in terms of allowing a juror to testify about the influences affecting deliberations. While the Texas version limits a juror's ability to testify to outside influence and qualifications to serve as a juror, the federal rule reads as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

FED.R.EVID. 606(b) (emphasis added).

and application of the court's instructions is a part of the deliberative process and was correctly excluded" under federal rule 606(b)), *cert. denied*, 516 U.S. 1180, 116 S.Ct. 1280, 134 L.Ed.2d 225 (1996); *Peveto v. Sears, Roebuck & Co.*, 807 F.2d 486, 488–89 (5th Cir.1987) (determining that even an erroneous instruction given to the jury through normal judicial proceedings did not constitute an outside influence under federal rule 606(b) because "outside influence" refers to an occurrence outside the normal courtroom proceedings).

We find these opinions very persuasive and conclude that the trial court's *Allen* charge occurred during a normal courtroom proceeding and was part of the jury's deliberative process. As such, we hold that the trial court's *Allen* charge was not an "outside influence" for purposes of 606(b).

▇▇▇ Appellant further argues on appeal that Sawyer's affidavit includes evidence that the jury was aware that Appellant was a registered sex offender and "such knowledge would constitute 'prejudicial extraneous information' that certainly qualifies as an 'outside influence.'" Appellant's argument, however, comprises one sentence of his brief, and he fails to explain which portion of Sawyer's affidavit proves that the jury was aware that Appellant was a registered sex offender. In fact, after a thorough review of Sawyer's affidavit we are unable to discern any proof that the jury was aware of Appellant's sex-offender status. Moreover, after an intensive review of Appellant's motion for mistrial as well as the hearing on that motion, we can find no evidence that Appellant brought his complaint to the trial court's attention.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex.R.App. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim.App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). Further, the trial court must have ruled on the request, objection, or motion, expressly or implicitly, or refused to rule, and the complaining party objected to the refusal. Tex.R.App. P. 33.1(a)(2); *Taylor v. State*, 939 S.W.2d 148, 155 (Tex. Crim.App.1996).

The only portion of Sawyer's affidavit that pertains to sex-offender status is her assertion that

> one juror talked on several days about having read the newspaper. I felt the other jurors knew things about the defendant that was not brought out in evidence. I don't know how many of them had been reading the newspapers but when the evidence came out about something called a SCRAM unit, I didn't know what it was. At some time after that several of the jurors knew what a SCRAM unit was and told me.

However, the only argument we can find on Appellant's part about this evidence is found in his motion for mistrial in which he states:

> The Court had instructed the jurors that they were not to read accounts of the trial in the local print media, nor watch such reports in the visual media. In direct violation of those instructions, Ms. Sawyer reports that one or more members of the jury had read such newspapers on several days. Further, that the content of those articles was discussed on more than one day.

There is absolutely no argument that the jury was aware of Appellant's sex-offender status. Furthermore, while this language in Appellant's motion is specific enough to

inform the trial court that the jury had read newspapers and listened to media reports, it does not specifically draw the trial court's attention to the fact that the jury was aware of Appellant's sex-offender status. As such, we conclude that Appellant has failed to preserve this error for our review. *See* TEX.R.APP. P. 33.1(a)(1); *Moreno v. State*, 952 S.W.2d 44, 45–46 (Tex.App.-San Antonio 1997, no pet.) (refusing to address appellant's complaint about the trial court's denial of his motion for mistrial because appellant failed to bring it to the attention of the trial court). Therefore, we hold the trial court did not err in overruling Appellant's motion for mistrial. Appellant's fourth point is overruled.

### C. ADMISSION OF POLYGRAPH EXAMINER'S TESTIMONY

Appellant argues in his seventh point that the trial court erred in overruling his motion for mistrial after one of the State's witnesses testified that he was of the opinion that: (1) Appellant's statement was untruthful; and (2) Appellant had killed Opal.

At trial, the State elicited the following testimony from Holden, the polygraph examiner who analyzed Appellant on the night of his arrest: [7]

[STATE:] Did something immediately prior to that happen inside the room of a—between you and Ricky Franks?

[WITNESS:] At the time he indicated he wanted to stop talking?

[STATE:] Yes.

[WITNESS:] Yes, it did.

[STATE:] What was it?

[WITNESS:] He got up from the chair he had been in, at the table we had

been sitting at, went into the corner of the room, put his arms around his waist, bent over a bit and said, "I don't want to talk to you anymore."

[STATE:] Immediately before that, had you said anything—had you said anything to Ricky Franks?

[WITNESS:] I had.

[STATE:] What did you say to him?

[WITNESS:] I told him that ... I thought he had killed Opal Jennings—

[DEFENSE COUNSEL]: 404(b), 38.22, *Schutz v. State, Kirkpatrick v. State, Turner v. State*, 702, 704.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Motion for mistrial.

THE COURT: Denied.

. . . .

[WITNESS:] I told him I believed at that point that he had killed Opal Jennings, that he knew where her body was, and I wanted to talk about that.

[DEFENSE COUNSEL]: Renew that objection, Judge.

THE COURT: Overruled.

 The State argues that any error was not preserved for appeal because Appellant failed to timely object to continued testimony on the admitted matter. However, Appellant is not complaining about the admission of such evidence; instead, Appellant contends the trial court abused its discretion in denying his motion for mistrial. Therefore, we believe Appellant has preserved error on his complaint about the trial court's denial of his motion.

 Appellant alleges that Holden's testimony fell outside the scope of rule 702

---

**7.** During trial, the jury was not aware that Holden was a polygraph examiner or had tested Appellant. Instead, the State introduced Holden as the owner of Behavioral

Measures in Forensic Services in Richardson, Texas, who had been called by the authorities on the night of Appellant's arrest to talk with Appellant.

of the rules of evidence. Rule 702 provides the type of testimony an expert witness may give. TEX.R. EVID. 702. Specifically, under Rule 702, to be admissible, expert testimony must be both reliable and relevant to help the jury in reaching accurate results. *See Jordan v. State,* 928 S.W.2d 550, 553–54 (Tex.Crim.App.1996); *Kelly v. State,* 824 S.W.2d 568, 572 (Tex. Crim.App.1992). Therefore, the testimony must not supplant the jury's decision. *Nejnaoui v. State,* 44 S.W.3d 111, 117 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). Pursuant to this prohibition, Appellant contends that Holden's testimony "simply told the jurors that he did not believe the Appellant's story." However, we can find no evidence that the State called Holden as an expert witness.

■ Further, even if Appellant were testifying as an expert witness, we conclude that the complained-of testimony did not involve an expert opinion. Instead, Holden was merely testifying about the events of the evening Appellant was arrested, which Holden personally observed and about which he had personal knowledge. TEX.R. EVID. 602 (requiring a witness to have personal knowledge of the matters about which they testify); TEX.R. EVID. 702 (explaining that expert testimony consists of "scientific, technical, or other specialized knowledge"); *Thomas v. State,* 916 S.W.2d 578, 580–81 (Tex.App.-San Antonio, 1996, no pet.) (holding police officer qualified to testify as both lay and expert witness); *Austin v. State,* 794 S.W.2d 408, 411 (Tex.App.-Austin 1990, pet. ref'd) (determining that police officer's testimony concerning the undercover meaning of certain prostitution phrases admissible as opinion testimony by a lay witness and as expert witness opinion testimony based on officer's training, experience, and years of service as police officer). Therefore, we hold Holden was qualified to testify about the events of the evening as a lay witness. Consequently, Holden was not bound by the confines of rule 702 concerning this testimony. As such, the trial court did not err in denying Appellant's motion for mistrial on this ground. Appellant's seventh point is overruled.

### D. STATE'S EXPERT WITNESS

■ Appellant contends in his eighth point that the trial court erred in overruling his motion for mistrial after the State's expert witness, Dr. Randy Price, testified that he believed Appellant's confession was truthful.

■ To be admissible, expert testimony must "assist" the trier of fact. TEX.R. EVID. 702; *Schutz v. State,* 957 S.W.2d 52, 59 (Tex.Crim.App.1997). Expert testimony assists the trier of fact when the jury is not qualified to "the best possible degree" to determine intelligently the particular issue without the help of the testimony. *Schutz,* 957 S.W.2d at 59. But, the expert testimony must aid, not supplant, the jury's decision. *Id.* Expert testimony does not assist the jury if it constitutes "a direct opinion on the truthfulness" of a statement. *Id.; see also Yount v. State,* 872 S.W.2d 706, 712 (Tex.Crim.App.1993) (holding that rule 702 does not permit an expert to give an opinion that the complainant or class of persons to which complainant belongs is truthful).

During its direct examination of Dr. Price, the State elicited the following testimony:

> [STATE:] Let's start off with the testimony of Dr. Richard Leo, if we could, please.
>
> [WITNESS:] Okay.
>
> [STATE:] I'll try to speed this up.
>
> He classified four types of false confessions. Do you recall that?
>
> [WITNESS:] I do.

[STATE:] And we created this little board here that outlines the four types of false confessions that Dr. Leo says are possible; is that correct?

[WITNESS:] That's correct.

[STATE:] Without taking you through each one of them, using Dr. Richard Leo's own criteria, do you believe the statement of Richard Franks is a false confession?

[DEFENSE COUNSEL]: Object to 702, 704 and *Schutz v. State.*

THE COURT: Overruled.

[DEFENSE COUNSEL]: Motion for mistrial.

THE COURT: Denied.

[DEFENSE COUNSEL]: Running objection.

. . . .

THE COURT: You may.

. . . .

[WITNESS]: From my understanding, both from the testimony yesterday of Dr. Leo and a study of the articles and studies that he's published, and my understanding of those four criteria for proving or to document that it's a false confession, that none of those apply in this case. So based on those criteria, I would say that it is not a false confession.

Appellant argues that Dr. Price's conclusion that he would not classify Appellant's statement as a false confession falls outside the acceptable bounds of proper expert testimony under rule 702 by divesting the jury of its fact finding function. Essentially, Appellant contends that Dr. Price's testimony constituted direct testimony that Appellant's statement was true in violation of *Yount.* The State counters, however, that it was entitled to introduce Dr. Price's testimony in order to rebut the possible suggestion from Dr. Leo's testimony and Appellant's cross-examination of other witnesses that Appellant's statement was false.

Even assuming without deciding that Dr. Price's testimony constituted a direct comment on the truthfulness of Appellant's statement, we believe any error was harmless. Because the error complained of does not involve a violation of the constitution, rule 44.2(b) is applicable. *Hughes v. State,* 12 S.W.3d 166, 168 (Tex.App.-Fort Worth 2000, no pet.). Therefore, we are to disregard the error unless it affected Appellant's substantial rights. TEX.R.APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Coggeshall v. State,* 961 S.W.2d 639, 643 (Tex. App.-Fort Worth 1998, pet. ref'd) (en banc). In making this determination, we review the record as a whole. *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1248.

As we have already explained, Appellant's statement cannot constitute a confession because it does not encompass all the requisite elements of the crime charged. Therefore, it is merely a statement that even if true does not alone inculpate Appellant. While Appellant's statement does place Opal in his car on the day in question, which may be circumstantially damaging, this same evidence was introduced through three other witnesses who testified either that they had overheard Appellant say or that Appellant told them directly that he had taken Opal to the store or to get something to eat and dropped her back off. Furthermore, Appellant's statement does contain some disturbing descriptions of Opal's alleged sexual advances toward Appellant during the trip; however, this same evidence, while not in such minute detail, was also introduced through An-

drew Bouyer. Therefore, the same general evidence contained in the Appellant's statement was introduced through several other witnesses.

Consequently, we conclude that, in the context of the entire case against Appellant, any error in the trial court's admitting Dr. Price's testimony concerning the truthfulness of Appellant's statement did not have a substantial or injurious affect on the jury's verdict and did not affect Appellant's substantial rights. *See King,* 953 S.W.2d at 271. Thus, we disregard the error. *See* TEX.R.APP. P. 44.2(b). Appellant's eighth point is overruled.

## VII. JURY CHARGE

■ Appellant alleges in his fifth point that the trial court erred in failing to include an article 38.23 instruction in the jury charge because there was ample evidence of a factual dispute as to the voluntariness of his statement necessary to support such an instruction.

■ Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State,* 871 S.W.2d 726, 731 (Tex. Crim.App.1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32. Error in the charge, if timely objected to in the trial court, requires reversal if the error is "calculated to injure the rights of the defendant," which means no more than that there must be some harm to the accused from the error. TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981); *see Abdnor,* 871 S.W.2d at 731–32; *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g). In other words, a properly preserved error will call for reversal as long as the error is not harmless. *Almanza,* 686 S.W.2d at 171.

■ Under article 38.23 of the code of criminal procedure, the trial court is required to exclude any evidence that it finds, as a matter of law, was obtained in violation of the Constitution or the laws of the United States or of the State of Texas. TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2002); *Hardin v. State,* 951 S.W.2d 208, 210 (Tex.App.-Houston [14th Dist.] 1997, no pet.). However, where there is a fact issue regarding the manner in which the evidence was obtained, article 38.23 permits the court to submit the question to the jury. *Hardin,* 951 S.W.2d at 210. In such event, the trial court must include in its final charge an instruction that, if the jury "believes, or has a reasonable doubt, that the evidence was obtained in violation of ... [any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America,] ... then and in such event, the jury shall disregard any such evidence so obtained." TEX.CODE CRIM. PROC. ANN. art. 38.23; *see also Reynolds v. State,* 848 S.W.2d 148, 149 (Tex. Crim.App.1993).

■ The terms of article 38.23 are mandatory, and when an issue of fact is raised as to compulsion or persuasion in obtaining a confession, a defendant has a statutory right to have the jury charged accordingly. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23. The only question is whether, under the facts of a particular case, the defendant raised the issue by the evidence, thus requiring the jury instruction. *Crunk v. State,* 934 S.W.2d 788, 794 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd).

Appellant requested the trial court to include an instruction in his charge to the jury that it was not to consider Appellant's statement to police unless it found beyond a reasonable doubt that Appellant's statement had not been obtained in violation of

any constitutional provision or statute. As we have previously explained, a statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion. TEX.CODE CRIM. PROC. ANN. art. 38.21 (Vernon 1979); *Penry*, 903 S.W.2d at 744. Therefore, Appellant was required to produce evidence to raise a fact issue as to any of these elements.

There is no evidence in the record to suggest that Appellant was coerced or persuaded to give his statement. Instead, the evidence shows that Appellant was informed of his *Miranda* rights on multiple occasions; he manifested his comprehension of these rights in writing on several occasions; he was asked and he agreed to talk about the disappearance of Opal; he was provided with the opportunity to drink, eat, smoke, and go to the restroom; and he ended the discussions when he became tired. The only evidence Appellant points to in his brief to refute this evidence and support his contention that his requested article 38.23 instruction was required is the testimony of Dr. Richard Leo, who testified about the phenomenon of false confessions and psychological coercion by police. While Dr. Leo testified that mentally retarded individuals are a class of people who are susceptible to false statements and that detectives go to school to learn the psychological techniques to get a suspect to admit his involvement in a crime, on cross-examination he conceded that he had:

> very little information about his case. I have not been asked to review materials for this case. So I don't know any of the specifics. I know that a little girl disappeared. I know that someone has been charged with that disappearance. I know that a statement was made or signed. I know this is a high-profile case here in the Dallas area, Fort Worth

area. Other than that, I know nothing specifically about this case.

In fact, he further testified that it was his understanding that he was "giving general testimony about the field of research … and that this general information would be more appropriately evaluated by a trier of fact rather than review materials and giving specific opinions about what [he thought]." Therefore, because Dr. Leo failed to give any testimony about the specific facts at issue in this case, we conclude that his testimony fails to raise a fact issue as to coercion necessary for the inclusion of an article 38.23 instruction.

■ Appellant also requested an article 38.23 instruction on the effect of Appellant's mental deficiencies on his ability to freely and voluntarily waive his *Miranda* rights. However, the court of criminal appeals has consistently held that such an instruction constitutes an impermissible comment on the weight of the evidence. *See Rocha v. State*, 16 S.W.3d 1, 21 (Tex. Crim.App.2000) (explaining that an appellant's requested instruction focusing on illness as a factor that may render his confession involuntary constituted a comment on the weight of the evidence); *Penry*, 903 S.W.2d at 748 (concluding that it would have been an improper comment on the evidence for the trial court to include the issue of mental retardation in the jury charge); *Bell v. State*, 582 S.W.2d 800, 812 (Tex.Crim.App.1979) (holding appellant's specially requested charge singling out the issue of mental retardation would have been an improper comment on the weight of the evidence), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981). Therefore, we conclude that the trial court did not err in refusing to instruct the jury to consider Appellant's mental disability in determining the voluntariness of his statement. Appellant's fifth point is overruled.

## VIII. MOTION FOR CONTINUANCE

In his sixth point, Appellant argues that the trial court erred in failing to grant his motion for continuance. The Friday before voir dire, the State informed Appellant of its intent to call two jailers to testify about statements they had overheard Appellant make while he was incarcerated on the charge at issue. Appellant filed a written motion for continuance or in the alternative a motion to prohibit the witnesses from testifying. Specifically, Appellant alleged that due to the timing of the State's disclosure he was unable to investigate the facts and circumstances surrounding the statements the witnesses were prepared to testify about. The trial court overruled the motion and allowed the witnesses to testify. We will review the trial court's refusal of Appellant's requested continuance for an abuse of discretion. *See Matamoros v. State*, 901 S.W.2d 470, 478 (Tex.Crim.App.1995); *Smith v. State*, 721 S.W.2d 844, 850 (Tex.Crim.App.1986).

The only argument Appellant provides in his brief as support for his conclusion that the trial court abused its discretion in denying his motion for continuance is that his "trial strategy was hampered by the late supplementation . . . and left the Defense with few options to counter such critical, damning testimony concerning Appellant." He further clarifies that his trial strategy was adversely affected because he was unable "to conduct an effective inquiry into the [jailers'] backgrounds as well as any possible motivations the witnesses may have had for making such incriminating, damaging statements." However, the court of criminal appeals has held that the trial court's refusal to grant a continuance to allow a party to discover impeachment evidence does not constitute an abuse of discretion. *See Keel v. State*, 434 S.W.2d 687, 689 (Tex.Crim.App.1968); *see also Cooper v. State*, 509 S.W.2d 565, 568 n. 2 (Tex.Crim.App.1974). Therefore, absent any additional argument in support of Appellant's contentions, we must conclude that the trial court did not abuse its discretion in refusing Appellant's motion for continuance in order to allow Appellant to discover impeachment evidence.

Nevertheless, even if Appellant's argument can be read to complain about his inability to discover evidence competent aside from its impeachment value, Appellant must show that he was prejudiced by his counsel's inadequate preparation time to establish an abuse of discretion on the part of the trial court. *Wright v. State*, 28 S.W.3d 526, 532 (Tex. Crim.App.2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001); *Heiselbetz v. State*, 906 S.W.2d 500, 511 (Tex.Crim.App.1995).

Appellant contends that the trial court's denial of his motion rendered him unable to investigate the witnesses' backgrounds and motives, but he fails to establish any actual prejudice. A mere statement that counsel did not have enough time to prepare an adequate defense does not demonstrate prejudice; instead, Appellant must establish a specific prejudice to his cause arising from the trial court's failure to continue the trial. *See Heiselbetz*, 906 S.W.2d at 511-12. Likewise, a bare assertion that counsel did not have adequate time to interview the State's potential witnesses does not alone establish prejudice. *Id.* at 512.

Moreover, the substance of these two witnesses' testimony was substantially similar to the testimony of witnesses already known to Appellant. As we addressed in Appellant's legal sufficiency point, Andrew Bouyer, an inmate who had become acquainted with Appellant in jail, testified that Appellant told Bouyer that he had picked Opal up, but had dropped her off and that the authorities would never find

her. Appellant was aware of this testimony. The State's "surprise" witnesses, Robert Wood and Roger Polson, were officers at the jail during Appellant's stay, who had overheard Appellant's discussions with other inmates and had directly discussed Appellant's dilemma with him personally. They testified that Appellant said that he had taken Opal and dropped her off and said that the authorities could not convict him because they did not have a body and would not find it. Further, Appellant was able to cross-examine Polson about a reprimand in his personnel file concerning Polson's concealment of a material fact about a matter under investigation. Therefore, given the totality of the circumstances, we cannot conclude that Appellant was actually prejudiced by the tardiness of the disclosure.

■■■ Appellant further contends that the trial court erred in allowing Wood and Polson to testify. The decision to allow a witness who was not on the State's witness list to testify is also a matter within the court's discretion. *Stoker v. State,* 788 S.W.2d 1, 15 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). Among the factors a reviewing court considers in determining whether there has been an abuse of discretion are: (1) a showing of bad faith on the part of the prosecutor in failing to disclose the witness's name before trial; and (2) whether the defendant could have reasonably anticipated that the witness would testify. *Id.; see also Fincher v. State,* 980 S.W.2d 886, 888 (Tex.App.-Fort Worth 1998, pet. ref'd).

The record does not reflect bad faith on the part of the prosecutor. In fact, Appellant's defense counsel's testimony from the hearing on Appellant's motion indicates that the State did not even become aware of these two witnesses until three days to a week before it gave Appellant notice that it intended to call them as witnesses. Therefore, the evidence suggests that Wood and Polson were a "surprise" to both sides. *See Fincher,* 980 S.W.2d at 888. While the State's notification was close in time to trial, it was provided in a manner that does not demonstrate bad faith. Appellant's sixth point is overruled.

## IX. INEFFECTIVE ASSISTANCE OF COUNSEL

■■■ Appellant contends in his ninth point that his trial counsel was ineffective. We apply a two-pronged test to ineffective assistance of counsel claims. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim. App.1999). First, Appellant must show that his counsel's performance was deficient; second, Appellant must show the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Hernandez v. State,* 988 S.W.2d 770, 770 n. 3 (Tex.Crim.App.1999).

■■■ In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson,* 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson,* 9 S.W.3d at 814. Our scrutiny of counsel's performance must be highly deferential, and every effort must be made

to eliminate the distorting effects of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Appellant points to three separate instances during trial that demonstrate the ineffectiveness of his trial counsel. In particular, Appellant complains about:

- his trial counsel's questioning of a witness that "was certain to elicit a response that informed the jury that Appellant had been enrolled in a sex offender registration program";
- his trial counsel's statement during cross-examination of a witness that Appellant had a probation officer; and
- his trial counsel's opening the door for the State to introduce oral statements Appellant had made and that had been conditionally suppressed.

Appellant did not file a motion for new trial complaining of his trial counsel's ineffectiveness and has otherwise failed to develop evidence rebutting the presumption that counsel rendered effective assistance. When the record is silent as to counsel's reasons for performing or failing to perform in the manner alleged, we cannot conclude that counsel's performance was deficient. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App.1994); *see also Grant v. State*, 33 S.W.3d 875, 879–80 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). Therefore, Appellant has failed to meet the first prong of *Strickland*. Because Appellant has not met his burden of showing that his trial counsel's assistance was ineffective, we overrule his ninth point.

## X. CONCLUSION

Having overruled Appellant's nine points on appeal, we affirm the trial court's judgment.