

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-439-CR

JODY SHANE MEADOR                                          APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

### FROM THE 235TH DISTRICT COURT OF COOKE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant Jody Shane Meador appeals his conviction and one-year sentence for evading arrest. In two issues, he contends that his state and federal constitutional rights were violated when the State violated the trial court's discovery order by withholding evidence and that the evidence is legally and factually insufficient to support his conviction. We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

**Sufficiency of the Evidence**

The State charged appellant with evading arrest after he was chased by a Texas Department of Public Safety trooper and at least one Gainesville police officer while speeding on his motorcycle. In his second issue, appellant challenges the legal and factual sufficiency of the evidence to support his conviction.[2]

## A.    Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is

---

[2] Because we discuss the factual background in detail in our analysis of this issue, we address it first.

nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were

3

in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

## B.    Applicable Facts

While on duty in the Gainesville area, around midnight on November 3, 2005, Texas Department of Public Safety Trooper Barrett Brown noticed a vehicle with a single headlight traveling northbound on Interstate 35 at eighty-six miles/hour in a sixty-five mile/hour zone. Trooper Brown was sitting in a "marked black and white Texas state trooper car," which he had parked on the service road near an entrance ramp so that he could run radar. As the vehicle passed, Trooper Brown saw that it was a motorcycle. Trooper Brown then turned his car around and started to follow the motorcycle on the highway, but he did not turn on his car's headlights. According to Trooper Brown, he did not want the driver of the motorcycle to see him and "take off going around the curve" until he increased his speed. Once Trooper Brown was able to speed up, he turned on his car's headlights.

4

Trooper Brown testified that he believed the driver of the motorcycle had seen him enter the highway and that the driver then accelerated to one hundred thirty-six miles/hour in a sixty-five mile/hour zone. After Trooper Brown turned on his car's headlights, the driver of the motorcycle exited the highway at the North Grand exit. Trooper Brown testified that at that point he caught up to the motorcycle and activated his car's overhead emergency lights and "wigwags," the flashing white lights on the front of the car.[3] He saw the driver of the motorcycle turn right and back southbound while running the stop sign at the intersection of the service road and North Grand;[4] the driver then accelerated "up to 140 miles an hour."[5]

Trooper Brown then saw the motorcycle drive "up and around by the school and down by the gas station of Wal-Mart." At that point, Officer Proffer, a Gainesville police officer who was traveling northbound on North Grand, saw the motorcycle and turned around to follow it. That officer turned

[3] Trooper Brown admitted on cross-examination that he had followed the motorcycle for approximately four miles before turning on the car's overhead lights.

[4] Although North Grand intersects the northbound and southbound I-35 service road, it does so on the diagonal, so that it runs northbound and southbound as well.

[5] According to Trooper Brown, he turned on his car's emergency overhead lights after appellant ran the stop sign but while Trooper Brown was still driving on the exit ramp about six to eight car lengths behind.

5

his overhead lights and wigwags on and got in front of Trooper Brown; the driver of the motorcycle then turned left (eastbound) on Highway 82, running the stop sign at that intersection as he did so. He then accelerated "to a high rate of speed" but finally stopped when he missed a curve and wrecked the motorcycle. Trooper Brown was able to maintain visual contact of the motorcycle the entire time he was following it.

After the motorcycle crashed, CareFlite took the driver to the hospital. Officers searched the motorcycle and in a fanny pack found identification with appellant's name on it and a small amount of white powder that field-tested positive as methamphetamine.[6]

Trooper Brown identified the driver of the motorcycle as appellant. According to Trooper Brown, he determined that appellant lived in Whitesboro, and that a "normal person going to Whitesboro" would not have exited on North Grand and driven southbound to Highway 82 but would instead have taken the Highway 82 exit directly off of I-35, two exits before the North Grand exit. Trooper Brown agreed that instead of taking this exit, appellant sped up dramatically and then drove down two more exits to North Grand. He testified

---

[6] The powder later tested out at the lab to be less than one gram of methamphetamine. Although the State also charged appellant with possession, it later dismissed that part of the indictment because the jury could not agree on a verdict.

that a person fleeing police on a motorcycle might want to avoid that part of Highway 82 because the Gainesville Police Department building was located a half block off Highway 82 and the driver was more likely to be stopped in that area because of a higher concentration of police.

When asked if he had his sirens on while following the motorcycle, Trooper Brown testified, "I believe so.  Yes, ma'am."  But he did not know if the other officer had his sirens on.

During Trooper Brown's testimony, the jury viewed a videotape (without the audio portion) taken by a recorder in Officer Proffer's vehicle.  The video starts as appellant, with the officer behind him, is approaching Highway 82. The patrol car's blue and red overhead lights are visible.  Appellant can be seen braking as he approaches the intersection of North Grand and Highway 82 and then accelerating through the stop sign in a left turn onto the highway. Appellant then appears to accelerate through the turn until he disappears from the camera's view as Officer Proffer turns his patrol car.  When appellant reappears in the camera's view, he is driving straight on Highway 82, and the brake lights of the motorcycle are not on.  Appellant then brakes again at the approach to the almost ninety-degree curve; at that point, he crashes the motorcycle.

On cross-examination, Trooper Brown testified that Officer Proffer's emergency overhead lights were already on when appellant passed him on the motorcycle. He agreed that an in-car video camera starts recording when the overhead lights are activated, but he also said that there is an eight to twelve second delay.[7]

Appellant testified that when Trooper Brown spotted him, he was "probably going too fast" because he had just recovered the motorcycle from the residence of a friend who had stolen it from him. He thought someone could be chasing him. He was on I-35 headed to his girlfriend's house but changed his mind and turned around to go back home. He also said that he took the North Grand exit instead of the Highway 82 exit because "[a]nybody that rides a motorcycle don't want to go through the middle of town because they've got to stop, put down their feet, so much extra. You stay on the highway, straight shot." Appellant said that he never saw any officers behind him and that he kept his eyes only on the road in front of him because he was going so fast.

---

[7] Although in his brief, appellant dismisses this testimony as "ridiculous," there is no evidence to rebut it other than his cross-examination of Trooper Brown.

According to appellant, he never saw a police car until he encountered Officer Proffer driving in the opposite direction on North Grand, at which point he "went slamming on the brakes in order to avoid a ticket." He said the officer did not have his lights on when he passed him. However, appellant must have seen Officer Proffer slow down to turn because he also said, "To me, it was just a normal vehicle turning to the left. And I thought I'd shut my bike down fast enough." According to appellant, he saw a flicker of blue or red light in the corner of his eye when he turned left on Highway 82, and he crashed on the curve when he turned around to see if he was being followed. That was the first time he knew officers were trying to stop him. Appellant testified that he never intentionally evaded arrest. He also testified that his driver's license was in the fanny pack on the motorcycle when his friend stole it but the drugs were not.

On cross-examination, appellant agreed when the prosecutor asked him if it was just coincidence or "[p]erhaps a turn" that caused him to increase his speed from eighty-six miles/hour to one-hundred forty miles/hour after he initially passed Trooper Brown on I-35.

9

**C.  Analysis**

A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or detain him.  Tex. Penal Code Ann. § 38.04(a) (Vernon 2003); *Vann v. State*, 216 S.W.3d 881, 888 (Tex. App.—Fort Worth 2007, no pet.).  Therefore, the evidence must show that the accused knew that a peace officer was attempting to arrest or detain him.  *Jackson v. State*, 718 S.W.2d 724, 726 (Tex. Crim. App. 1986).

Appellant claims that the evidence shows that "at no time [was he] intentionally fleeing [Trooper] Brown and at no time was he on notice of an imminent arrest or detention."  According to appellant, the evidence supports his version of events—that he did not see any police officer following him until he turned around before crashing at the curve on Highway 82.

However, appellant's testimony conflicts with Trooper Brown's testimony and the videotape viewed by the jury.  Trooper Brown testified that appellant increased his speed significantly after he initially passed Trooper Brown; thus, although Trooper Brown was not attempting to detain appellant at that time, the evidence shows that appellant was aware of a police officer's presence.  Appellant admitted he was aware that Officer Proffer was turning as appellant passed by him on North Grand; the videotape shows that the officer was not far behind appellant when appellant braked and ran the stop sign at Highway

10

82 while turning left onto the highway. This evidence casts doubt on appellant's explanation that he "slammed" on the brakes after seeing Officer Proffer to avoid a ticket. The jury was entitled to question why appellant would reduce his speed, only to then run a stop sign immediately afterward. The lights from Officer Proffer's patrol car are clearly visible in the videotape as he is following appellant. In addition, although appellant can be seen braking before running the stop sign at Highway 82, he does not appear to have "slammed" on his brakes.

We must defer to the jury's resolution of conflicts in the evidence; thus, we conclude and hold that the evidence is both legally and factually sufficient to support appellant's conviction for evading arrest. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). We overrule appellant's second issue.

**Whether State Improperly Failed to Disclose Evidence**

In his first issue, appellant contends that the State improperly suppressed the videorecording from Trooper Brown's in-car camera, violating his rights to due course of law under the Texas Constitution and due process under the United States Constitution.

11

## A.    Applicable Facts

Before trial began on July 24, 2007, the day after voir dire, appellant's trial counsel told the judge that the State had informed him the day before (but after voir dire) that the State

> had a videotape that had never been turned over to the Defense . . . [and] that their office had erased most - - the relevant parts of that videotape before the . . . trial. And, of course, she just found out about it, I think, I believe, and she can speak for herself, but I believe she found out about that yesterday but we were never produced that - - that item, which, of course, could have Brady material and exculpatory material on it . . . .

Appellant's counsel asked, "Judge, I'm going to need some time to examine those items at least sometime during the trial, at the very least in order to be able to present my defense adequately because [of] these discovery violations by the District Attorney's office." The prosecutor replied that she had given the video to support staff and told that person to copy it; instead, that person erased the video. In response to the trial court's questioning, appellant's counsel testified that he wanted to see the partial video and question Trooper Brown about it after the State rested.

Before trial began the next day, appellant's trial counsel told the trial court that he had been able to view the partial video. He moved that the case be dismissed for violation of appellant's rights to due course of law and due process as a result of the State's blatant violation of discovery orders.

12

Appellant's counsel told the court that the only reason he was not asking for a mistrial was because his client did not want one; he had been in jail waiting for trial for over six months. Counsel also declined to request a continuance.

During trial, appellant's counsel called District Attorney Investigator Brand Webb as a witness. Investigator Webb testified that on the Monday before trial, the prosecutor gave him a videotape to copy. He did not know what was on the videotape until later when he learned that it was the videotape from Trooper Brown's patrol car. However, Investigator Webb further testified that when he attempted to copy the videotape, he accidentally reversed the tapes; he put the original where the copy should go and the copy where the original should go. He agreed that as a result of the erasure, the jury would not be able to view a videotape from Trooper Brown's vehicle.

## B. Analysis

Under *Brady v. Maryland*,[8] to ensure the accused a fair trial, a prosecutor has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to turn over to the accused all exculpatory or impeachment evidence, irrespective of the good faith or bad faith of the prosecution, which is favorable to the defendant and is material to either guilt or punishment.

---

[8] 373 U.S. 83, 83 S. Ct. 1194 (1963).

13

*Kyles v. Whitley*, 514 U.S. 419, 432–33, 115 S. Ct. 1555, 1565 (1995); *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 3379 (1985); *Franks v. State*, 90 S.W.3d 771, 796 (Tex. App.—Fort Worth 2002, no pet.). A due process violation occurs if (1) the prosecutor fails to disclose evidence that is (2) favorable to the defendant and (3) material. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); *Franks*, 90 S.W.3d at 796.

However, in a case in which the State fails to preserve evidence that *may have been useful* to an appellant, we apply a different test. *Williams v. State*, 906 S.W.2d 58, 61 (Tex. App.—Tyler 1995, pet. ref'd). The failure to preserve potentially useful evidence is not a denial of due process unless a criminal defendant can show bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337 (1988); *Thomas v. State*, 841 S.W.2d 399, 402 n.5 (Tex. Crim. App. 1992); *Jackson v. State*, 50 S.W.3d 579, 589 (Tex. App.—Fort Worth 2001, pets. ref'd); *Williams*, 906 S.W.2d at 61.

Here, there is no evidence that the destruction of the videotape was the result of bad faith. Investigator Webb testified before the jury that the prosecutor had asked him to copy the tape so that it could be produced to the defense, but he accidentally erased the tape instead. After he confirmed that the erasure was accidental, appellant did not ask any further questions. Appellant did not contend at trial and does not contend on appeal that the

14

erasure of the videotape was the result of bad faith. Accordingly, we conclude and hold that appellant did not show bad faith such that he is entitled to relief. *See Jackson*, 50 S.W.3d at 589; *Williams*, 906 S.W.2d at 61. We overrule his first issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 16, 2008

15