

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00264-CR

_____

JOSEPH MCDONALD, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. F17-938-431

Before Sudderth, C.J.; Walker and Kerr, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Joseph McDonald appeals his conviction and ten-year sentence for assault–family violence with a prior conviction. *See* Tex. Penal Code Ann. § 22.01 (West Supp. 2018). He brings three issues: (1) did the trial court abuse its discretion by denying his motions for continuance? (2) was the evidence sufficient to prove he was the person who assaulted the complainant? and (3) was the evidence sufficient to prove that Denton County was the proper venue? Holding that the trial court did not abuse its discretion by denying McDonald's continuance motions and that sufficient evidence supports both the conviction and the venue, we affirm.

## I. The evidence sufficed to show that it was McDonald who assaulted Isaacson. *(Issue 2)*

McDonald contends that the trial court erred by finding him guilty because the State failed to prove beyond a reasonable doubt that it was he who assaulted the complainant, Marcie Isaacson.[1] The gist of McDonald's argument is that Isaacson gave multiple stories about what happened, that not all of her stories identified him as the person who assaulted her, and that discerning the truth beyond a reasonable doubt from her testimony was not possible because she lacked any credibility. McDonald buttresses his insufficiency argument with the trial court's own description of the police department's investigation as "atrocious."

---

[1]Although McDonald challenges evidentiary sufficiency in his second issue, we address it first because this issue, if sustained, would afford him the greatest relief. *See Mixon v. State*, 481 S.W.3d 318, 322 (Tex. App.—Amarillo 2015, pet. ref'd).

**A. Standard of review**

When reviewing the evidentiary sufficiency to support a conviction, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential criminal elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and must defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

3

**B. The evidence**

**1. Officer Jameson Ruff**

Officer Ruff of the City of Lewisville Police Department was on patrol around 2:00 a.m. on March 21, 2015, when he was dispatched to a QuikTrip in Lewisville, Denton County, Texas. There he met Isaacson, who had a small laceration on her nose and blood on her face, shirt, and pants and who appeared to be extremely upset by whatever had just occurred. He could tell from smelling alcohol on her breath that Isaacson had been drinking. Isaacson said that she and her boyfriend—McDonald— had been at an IHOP, where they began arguing with several people at another table. According to Officer Ruff, Isaacson told him that she was trying to stick up for McDonald at the IHOP; that McDonald became upset after she called another woman a skank; and that after they left the IHOP, McDonald had backhanded her in the face multiple times.

Up until this point, Officer Ruff described Isaacson as cooperative, but that changed when he explained to her that he had to make a report. Even then, though, she did not change her story; she said only that she did not want to move forward with any charges. Office Ruff also testified that at the QuikTrip, Isaacson said nothing about having gotten into a physical altercation with anyone at the IHOP.

From the QuikTrip, Officer Ruff took Isaacson back to her hotel, which was about a mile away, and determined that McDonald was not there. Hotel security made Isaacson a new key and deactivated the others.

4

His shift over, Officer Ruff went home and went to sleep. But when he returned to work later that day around 2:00 p.m., he learned that Isaacson had been trying to contact him. Speaking with her that evening, Officer Ruff heard a different story, one in which the assault had occurred at the IHOP or at a Denny's. There were two IHOPs in Lewisville, but Officer Ruff said that Isaacson could not clarify which one she was talking about. In any event, Officer Ruff never went to either IHOP or to any Denny's to learn more but simply passed the information on to the detective.

Officer Ruff did not believe Isaacson's new story about the IHOP; he believed her initial account that McDonald had assaulted her. He explained that he had previously encountered situations where victims had tried to protect their abusers.

### 2. Marcie Isaacson

Isaacson testified that she and McDonald were in a romantic relationship and traveled from state to state, wherever his jobs took him. One of those jobs took them to the Dallas–Fort Worth area in March 2015.

On March 20, she and McDonald went to a country and western club, Red River, in Dallas. When they left Red River, McDonald was "pretty intoxicated."

From Red River, they went to an IHOP to have breakfast. There they encountered "some skinheads or something," and McDonald had "words" with some girl, so they left.

On their way back to the hotel, Isaacson and McDonald got into an argument during which McDonald forcefully backhanded her in the face, causing blood to gush

5

from her nose and mouth and over her hands and clothes. Isaacson testified that she started crying and told McDonald that she could not believe what he had done, to which McDonald responded by twice more hitting her hard in the face. Asked if being backhanded had hurt, she said, "Absolutely."

When the assault did not stop, Isaacson started screaming, kicking the radio, and telling McDonald to let her out of the car, so he pulled over to the parking lot of a closed Valero gas station. After Isaacson got out, McDonald drove off, and Isaacson found herself alone at the closed Valero in the dark with no phone, no purse, no money, and no idea where she was. After waiting a few minutes hoping that McDonald would come back, she walked to an open gas station across the street to get help.

At that gas station, someone called for help, and eventually paramedics and a police officer (Officer Ruff) arrived. Isaacson told the officer what had happened but explained that she did not want McDonald to get in trouble; she wanted only to scare him so that he would not "do this again." She admitted to the officer that both she and McDonald had been drinking. Making excuses for McDonald, Isaacson asked the officer not to arrest him because if McDonald went to jail, she was afraid that she would be homeless. She explained at trial that "he had made threats to me before," and added, "I was not working because we were traveling. It is hard to find a job. I didn't have a car. I was completely under his control."

Isaacson testified that the officer took her back to her hotel and got her back into her room. The hotel changed the locks for her.

Later that same morning, McDonald came back and instructed Isaacson to tell the police that it had been some girl at a bar or "IHOP or a breakfast place" that she had fought with. McDonald further told her to pretend not to know the restaurant's name or location in case a named restaurant had cameras. Isaacson testified that she did as McDonald had asked but that the police did not believe her when she called to say that she wanted the report to go away because in fact a woman at the IHOP had assaulted her after she had called the woman a skank. Isaacson said that McDonald was with her when she made the call.

When the police arrested McDonald not long afterward, she found the moment "bittersweet"—relief because he was gone, but the "bitter part" was that she did not know what she was going to do. What Isaacson ended up doing was bonding McDonald out of jail and getting back together with him. At some later point, Isaacson moved to Oklahoma City to live with her parents.

About a year later, notwithstanding their being separated and no longer dating, McDonald continued to write Isaacson letters asking her to lie to protect him. The trial court admitted two such letters.

Isaacson said that McDonald wanted her to sign a letter exculpating him, so she did; she even had it notarized. In that letter, she asked that the charges against him be dropped, asserted that he was not responsible for her injuries, and averred that on the

7

date in question she was in an altercation with another female in a restaurant parking lot. At trial, Isaacson said that McDonald had coerced her into signing it by threatening to call her ex-husband and tell him lies, thereby compromising her ability to see her children again. (At the time, she could visit her children but did not have full custody.)

Also at trial, Isaacson admitted that roughly ten days after the March 21 assault, she told the detective working her case, Scott Austin, yet another story: that she had gotten jumped at Red River. She also told him that her memory "might not have been that great" because she had been drinking shots that night and was drunk—something that she conceded at trial was untrue.

She further admitted that in order to get another room key, she had told a hotel employee that her purse had been stolen. Isaacson explained that she had "lied to [the hotel employee] so she wouldn't kick [McDonald] out for having charges of hitting me. Because there had already been incidences in the room of him hitting me."

### 3. The hotel general manager

April Brennan worked as general manager at the hotel where McDonald and Isaacson were staying. In late March 2015, McDonald requested a key programmed for the room, but Brennan refused based on a note in the room's folio indicating an incident the night before and reflecting that officers had said it was probably best not to give him a key. McDonald then told Brennan that Isaacson had gotten into a fight, that Isaacson had told the police "some stuff," but that everything was fine. Brennan

then spoke to Isaacson, who confirmed McDonald's story that she had gotten in a fight over a stolen purse, that nothing had happened, and that she and McDonald were fine. Based on those conversations, Brennan gave McDonald a room key.

### 4. The family-violence victim-intervention specialist

Amanda Mention worked for the Denton County District Attorney's office as a victim-intervention specialist for family-violence victims. When Mention and Isaacson spoke on the phone in June 2015, Isaacson told Mention that she had gotten into a confrontation with a girl at the IHOP and that it was this girl who had assaulted her. Financially dependent on McDonald and fearful that she would be homeless and have nowhere to go, Isaacson expressed reservations about pursuing the charges. According to Mention, it is not uncommon in family-violence cases for victims to tell the police one thing and then tell her something completely different.

### 5. Detective Scott Austin

Scott Austin, a domestic-violence detective for the Lewisville Police Department, was assigned McDonald and Isaacson's case in March 2015. When he talked to Isaacson, she was cooperative but did not want McDonald prosecuted.

As Detective Austin knew from the police report, Isaacson's initial story was that her boyfriend had assaulted her. Detective Austin also knew that she had later told Officer Ruff by phone that a female had assaulted her at the IHOP.

And then Isaacson gave Detective Austin yet another story: she and McDonald had gone to Red River where they had a verbal altercation with some women, and

when she and McDonald later went to the IHOP, they encountered those same women and had another altercation, and one of the women assaulted her in the parking lot.

As a family-violence detective, Austin said that it was common to hear changing stories and excuses. "A lot of the reasons are monetary. He might be the primary breadwinner. The victim may not have a place to stay if the Defendant is arrested, no family in town, no friends in town. There [are] different reasons." In Detective Austin's experience, domestic-violence victims are most truthful "[r]ight when the officer is there in the heat of the moment."

In short, Detective Austin thought that McDonald had in fact assaulted Isaacson. He did not believe the story that someone else had assaulted Isaacson at the IHOP because McDonald was not with her either at the QuikTrip or at the hotel down the road.

When McDonald was arrested on April 1, 2015—an arrest at which Detective Austin was present—he did not deny that the assault had occurred. Rather, McDonald asked why the police were arresting him after Isaacson had told them that she did not want them to pursue the case. Similarly, when Detective Austin told Isaacson that McDonald was being arrested, she also did not deny that the assault had occurred.

Detective Austin acknowledged that IHOP had video cameras, but he did not go there to talk to anyone or to ask to see a video because Isaacson had said that the

altercation took place outside in the parking lot. He had previously worked security at IHOP and testified that its parking lot had no cameras. Moreover, Detective Austin stated that going to the IHOP a week after the incident would have been futile because IHOP had many intoxicated people and unruly events after midnight, so singling out one incident would be difficult.[2] He also stated that if Isaacson had in fact been assaulted at the IHOP, the call for the police should logically have come from there. Furthermore, Detective Austin was aware of Isaacson's initial report that McDonald had become angry at her because she had stuck up for him and that McDonald had responded by telling her to get in the car. In Detective Austin's view, McDonald's assaulting Isaacson in the vehicle was consistent with the original story that McDonald became angry at her for calling some other woman a skank.

In addition to not contacting the IHOP, Detective Austin did not contact Red River. When asked what he thought of Isaacson's later story that she and McDonald had argued with some women at Red River and then had found themselves running into those same women at the IHOP, Detective Austin responded, "It is hard to believe that two individuals who didn't know each other had an altercation at Red River and within 15 minutes are at the same IHOP in another city."

Detective Austin testified that Isaacson was just "flipping" her story; he believed the original story "and all the other evidence." He added that Isaacson "told

---

[2]Detective Austin admitted that he had first attempted to contact Isaacson on March 30, nine days after the assault.

11

me that [McDonald] could not be arrested. That if he was arrested, she would be homeless. She has no money if he is arrested. She has no family, no friends, and they had just moved here from Arkansas."

**C. Discussion**

Viewing the evidence in the light most favorable to the judgment, as we must, the evidence shows that McDonald assaulted Isaacson. That is what she told Officer Ruff, and that is what she testified to at trial. *See Jenkins*, 493 S.W.3d at 599. Although it is true that Isaacson gave other versions of the night's events, it is also true that she explained why she did so: she was afraid of being left homeless and of McDonald generally. Moreover, if someone other than McDonald had assaulted Isaacson, it would have been reasonable to expect McDonald to have been with her; he was not. Similarly, if someone else had assaulted Isaacson, when the police arrested him McDonald's only protest would not have been that Isaacson wanted the charges dropped, but it was. And although the trial court openly criticized the police department's investigation, it nevertheless ultimately found that the State had proved beyond a reasonable doubt that McDonald had committed the charged offense. Moreover, at trial, Isaacson consistently disavowed her recantations. The factfinder alone judges the evidence's weight and may choose to believe all, some, or none of it. *Moore v. State*, 935 S.W.2d 124, 126 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1219 (1997). Here, a rational factfinder could have found beyond a reasonable doubt

12

that McDonald was the person who had assaulted Isaacson. *See Jenkins*, 493 S.W.3d at 599; *Montgomery*, 369 S.W.3d at 192.

We overrule McDonald's second issue.

## II. The evidence was sufficient to show that venue was proper in Denton County. *(Issue Three)*

McDonald argues in his third issue that the State failed to prove by a preponderance of the evidence that Denton County was the case's proper venue. McDonald notes the considerable confusion over which of the two Lewisville IHOPs McDonald and Isaacson had visited and that the trial court openly questioned Detective Austin's testimony on whether the trip from the nearest IHOP to the QuikTrip would be entirely within Denton County. After Detective Austin testified, however, the State recalled Isaacson, and as we discuss below, regardless of whether the venue-related evidence was sufficient before she again took the stand, her later testimony sufficed to establish venue.

Venue in criminal cases need be proved only by a preponderance of the evidence, which may be either direct or circumstantial. Tex. Code Crim. Proc. Ann. art. 13.17 (West 2015); *see Couchman v. State*, 3 S.W.3d 155, 161 (Tex. App.—Fort Worth 1999, pet. ref'd). The trier of fact may make reasonable inferences from the evidence to decide a venue issue. *See Couchman*, 3 S.W.3d at 161. The venue evidence is sufficient if the factfinder may reasonably conclude that the offense was committed in

13

the county alleged. *Rippee v. State*, 384 S.W.2d 717, 718 (Tex. Crim. App. 1964); *Couchman*, 3 S.W.3d at 161.

When recalled as a witness, Isaacson testified that the assault went on for about five minutes with her trying to get away and that up until the point she was able to get out of the truck,[3] the assault was still occurring. The location where McDonald dropped her off was indisputably in Denton County. We hold that the State met its burden. *See Couchman*, 3 S.W.3d at 161.

We overrule McDonald's third issue.

## III. The trial court did not abuse its discretion by denying McDonald's second and third motions for continuance. *(Issue One)*

We conclude with McDonald's first issue, in which he argues that the trial court abused its discretion when it denied his second and third motions for continuance, contending that he was thereby precluded from presenting a meaningful defense. McDonald splits his arguments into two parts: (1) the trial court erred because McDonald had received additional evidence the day before trial and was denied the right to meaningfully review that evidence with his attorney, and (2) the trial court erred because (a) McDonald presented evidence that a material witness was unable to attend trial and (b) he had not yet received subpoenaed records from his employer.

---

[3]McDonald's vehicle was variously referred to at trial as either a "car" or a "truck."

14

## A. Standard of review

We review a trial court's ruling on a motion for continuance for an abuse of discretion, a standard under which we defer greatly to the trial court. *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002); *Cantu v. State*, No. 02-05-00436-CR, 2006 WL 1919684, at *1 (Tex. App.—Fort Worth July 13, 2006, no pet.) (mem. op., not designated for publication). Rulings within the zone of reasonable disagreement survive an abuse-of-discretion challenge. *Gallo v. State*, 239 S.W.3d 757, 777 (Tex. Crim. App. 2007), *cert. denied*, 553 U.S. 1080 (2008). In addition, to establish an abuse of discretion, the defendant must show actual prejudice. *Vasquez*, 67 S.W.3d at 240.

## B. McDonald's three continuance motions

McDonald attacks the denial of his second and third motions. Our first task is to define what those motions encompassed.

We set the stage with McDonald's first motion for continuance, which the trial court granted on February 14, 2017. McDonald does not (and could not) complain about that ruling. But we note that by the time McDonald went to trial—on August 8, 2017—more than 16 months had passed since the alleged offense and nearly six months had elapsed since the trial court had granted McDonald's first continuance.

Shortly before the August trial date, on July 27, McDonald moved for a continuance a second time. In that motion, he asserted that he needed more time to

get three witnesses, one of whom was Paul Daniel.[4] The trial court denied the motion on July 28. But McDonald's understanding was that if he continued having difficulties with trial evidence, the trial court would entertain a third motion.

So on the day of trial, McDonald filed, the trial court heard, and the trial court denied his third motion. The third motion was identical to the second except for one addition in which McDonald alleged that he had subpoenaed the records of "KBR" (without explaining what KBR was) and had not yet procured them. Neither McDonald's second nor third motion explained why the witnesses or (in the case of the third motion) the subpoenaed records would be material.[5]

## C. The hearing on McDonald's third motion

At the pretrial hearing on August 8, McDonald provided some context. One of the three witnesses, Paul Daniel, was supposedly present on the night in question. In his appellate brief, McDonald discusses only Daniel, whom McDonald acknowledged never subpoenaing.

---

[4]The motion identifies the witness as "Paul Daniels," but the last name of the witness who testified during the punishment phase on April 9 was "Daniel."

[5]After identifying the three witnesses, in both continuance motions McDonald asserted, "The testimonies to be procured from [the witnesses are] material to the Defendant's cause." Regarding the records, his third motion adds simply that "the Defense has subpoenaed records from KBR[,] and this subpoena was duly served and the return was filed with the District Clerk's office. To date the Defense has been unable to procure those records. These records are material to the Defense."

As for the records, McDonald acknowledged during the hearing that what he wanted were records from his own employer and that he wanted them to collaterally impeach Isaacson.

Finally, McDonald orally further moved for a continuance because late the day before, the State had given his counsel some documents: (1) letters from McDonald to Isaacson and (2) prosecutors' notes from when they spoke with witnesses as well as a timeline written by Isaacson.

The trial court overruled McDonald's motion.

### 1. Discussion on the newly produced documents

McDonald moved for a continuance because of newly produced documents only orally. "A criminal action may be continued on the written motion of the State or the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." Tex. Code Crim. Proc. Ann. art. 29.03 (West 2006). "All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." *Id.* art. 29.08 (West 2006). The court of criminal appeals has construed these statutes to require a sworn written motion to preserve appellate review from a trial court's denying a continuance; thus, if a party moves for a continuance orally and the trial court denies it, the party forfeits the appellate right to complain. *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009); *see Robinson v. State*, 310 S.W.3d 574, 578–79 (Tex. App.—Fort Worth 2010, no pet.) (same); *see Massimo v. State*, 144 S.W.3d 210, 215 (Tex. App.—Fort Worth 2004, no pet.) (same);

17

*cf. Marshall v. State*, 646 S.W.2d 522, 523–24 (Tex. App.—Houston [1st Dist.] 1982, no pet.) (holding that because an oral motion and the written motion to set aside the information addressed different issues, the oral motion preserved nothing for appeal because the statute required that such a motion be in writing). Because McDonald did not file a written and sworn motion based on the last-minute documents, his complaint is not preserved. *See* Tex. Code Crim. Proc. Ann. arts. 29.03, 29.08.

### 2. Discussion on Daniel, the absent witness

When the defendant bases a continuance motion on an absent witness, he must show (1) that the defendant has exercised diligence to procure the witness's attendance, (2) that the witness is not absent by the procurement or consent of the defense, (3) that the motion is not made for delay, and (4) the facts he expects the witness to prove. *Harrison v. State*, 187 S.W.3d 429, 435 (Tex. Crim. App. 2005). The motion must show on its face the absent testimony's materiality to the court; mere conclusions and general averments do not suffice. *Id.*

McDonald cannot meet the *Harrison* requirements. In both his second and third motions, he averred only generally that Daniel's testimony was material. Even if we were to consider McDonald's assertion at the hearing that Daniel was there on the evening in question, McDonald did not present what he expected Daniel's testimony to prove. *See id.*; *see also* Tex. Code Crim. Proc. Ann. art. 29.06 (West 2006).

Additionally, McDonald admitted not subpoenaing Daniel, which shows a lack of due diligence. *See Moore v. State*, 146 S.W.2d 762, 764 (Tex. Crim. App. 1940).

*Hughes v. State*, 962 S.W.2d 89, 90 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd);

*Ramirez v. State*, 842 S.W.2d 796, 800 (Tex. App.—El Paso 1992, no pet.).[6]

### 3. Discussion on the missing employer's records

As with his motions concerning absent witnesses, McDonald's third motion regarding as-yet-unobtained records averred materiality only generally and thus preserved nothing. *See Harrison*, 187 S.W.3d at 435.

Only by virtue of the August 8 hearing do we learn that the records McDonald wanted were his employer's and that he wanted them to impeach Isaacson. Even then, how he intended to impeach her is not clear from the record. But McDonald's contentions, even if considered, change nothing, because a trial court does not generally abuse its discretion when it denies a continuance sought to secure impeachment testimony. *See Keel v. State*, 434 S.W.2d 687, 688–89 (Tex. Crim. App. 1968); *Nichols v. State*, No. 02-13-00566-CR, 2014 WL 7779272, at *2 (Tex. App.—

---

[6]In his brief, McDonald asserts that Daniel was at Red River, but his record references do not support that proposition. When Daniel testified at the punishment trial on August 9, he stated that he lived a little over an hour from the courthouse. He attributed his failure to come to trial sooner to a tornado that destroyed 80% of his ranch on what appeared to be Sunday, August 6. Daniel's punishment testimony shed no light on what, if anything, he saw on the night McDonald assaulted Isaacson, but he shared an opinion or two regarding Isaacson. He "was not a fan of" McDonald's relationship with her because there was "always a drama, always tension." He stated that when drinking, she was aggressive, smart-mouthed, argumentative, and defiant. Most of the time McDonald would walk away, "[b]ut she would never allow that. She would constantly keep . . . running, keep talking." Daniel added, "It got to the point where I asked him not to . . . come to my place if she was with him." Despite all that, he also said that nothing a woman did would justify raising a hand to her.

Fort Worth Feb. 5, 2014, pet. ref'd) (mem. op., not designated for publication); *Franks v. State*, 90 S.W.3d 771, 808 (Tex. App—Fort Worth 2002, no pet.).

We overrule McDonald's first issue.

## Conclusion

Having overruled McDonald's three issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 25, 2018